IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| AIGBE AKHIGBE, Ph.D.           ) | CASE NO. |
| 463 Rachel Court                       ) | |
| Copley, Ohio 44321                   ) | HON. |
|                                                     ) | |
| BHANU BALASUBRAMNIAN, Ph.D. ) | |
| 108 Sendero Drive                     ) | **COMPLAINT** |
| Huntsville, Texas 77340            ) | |
|                                                     ) | |
|         Plaintiffs,                         ) | |
|                                                     ) | |
|         Vs.                                    ) | |
|                                                     ) | **JURY DEMAND ENDORSED** |
| UNIVERSITY OF AKRON         ) | **HEREON** |
| c/o Ohio Attorney General         ) | |
| 30 East Broad Street, 14th Floor ) | |
| Columbus, Ohio 43215             ) | |
|                                                     ) | |
|         Defendant.                        ) | |

Plaintiffs Professors Aigbe Akhigbe and Bhanu Balasubramnian (collectively, the "Plaintiffs"), by and through their undersigned counsel, allege as follows:

1. This is a race and national origin action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et seq.) ("Title VII"), filed by two Professors employed by the University of Akron until they were subjected to a reduction in force by the University in July of 2020.

2. Plaintiff Professor Akhigbe ("Akhigbe") is a black male born in Nigeria.

3. Plaintiff Professor Balasubramnian ("Balasubramnian") is an Asian female born in India.

4. Defendant University of Akron (the "University") is a state university located in Akron, Ohio.

5. The University is an employer within the meaning of Title VII.

## Jurisdiction

6. Plaintiffs filed charges with the Equal Employment Opportunity Commission and both received their right to sue notifications on August 5, 2022, within ninety (90) days of the filing of this Complaint.

7. Jurisdiction is conferred upon this Court pursuant to Title VII, 42 U.S.C. § 2000e-5.

8. Jurisdiction is conferred upon this Court by virtue of 28 U.S.C. § 1331 – federal question jurisdiction.

9. Venue lies in this forum pursuant to 28 U.S.C. § 1391(b) as the claims arose in the Northern District of Ohio, specifically Summit County, where Defendant University of Akron is headquartered.

## 2020 Reduction in Force

10. The University encountered significant budget problems in 2020 and, as a result, determined that it needed to reduce its expenses.

11. The University's College of Business Administration ("CBA") was targeted to achieve a 30% budget reduction in 2020. In order to achieve this 30% goal, numerous positions in the College of Business needed to be eliminated.

12. Plaintiffs were both selected by the University in July of 2020 to be eliminated as part of the 2020 Reduction in Force (the "RIF") and, as result, were terminated on August 21, 2020.

### Professor Aigbe Akhigbe

13. Plaintiff Akhigbe was hired as a tenured Full Professor and holder of the Moyer Endowed Chair in Finance by the Defendant on August 21, 2000. Prior to joining the Defendant, Akhigbe was employed as a tenured Full Professor at Florida Atlantic University.

14. In July of 2020, Akhigbe was one of nine faculty in the University's Department of Finance, which was part of the College of Business Administration, and one of six Endowed Chairs at the University.

15. Akhigbe was the only Endowed Chair with the University who was black and born in another nation. Four of the other Endowed Chairs were white and born in the U.S. and the fifth was Hispanic and born in the U.S.

16. Akhigbe was the only black faculty member in the Department of Finance and one of three foreign-born faculty in that Department. The Department of Finance consisted of six white and three non-white faculty, including Akhigbe.

17. In the CBA, Akhigbe was one of two black faculty and 21 foreign-born out of 52 faculty in the College.

18. As an Endowed Chair, Akhigbe's teaching responsibilities differed from those of other professors in the CBA and Department of Finance. As the

Moyer Endowed Chair, Akhigbe was contractually required to teach a lower class load than the regular faculty. This lower teaching load, however, was offset by much higher research and publication requirements imposed on Akhigbe by the Contract. A copy of Akhigbe's Contract with the University is attached hereto as Exhibit 1.

19. In 2020, the University's Saturday Executive MBA program was a growing segment of the University's offering. For more than a decade prior to the RIF, Akhigbe's teaching responsibilities included several of the Defendant's required Saturday Executive MBA courses.

20. Two months prior to the RIF announcement, on May 7, 2020, Akhigbe was unexpectedly informed by the Chair of the Department of Finance and Associate Dean of the CBA, Professor James Thomson ("Thomson"), that Akhigbe would no longer be teaching the required courses in the University's Saturday Executive MBA program and that he would be switched to teaching elective courses in the MBA program.

21. Thomson then assigned Professor John Goodell, a white American-born male, to teach the required MBA courses that Akhigbe had been teaching for years.

22. The transfer of two of these required MBA classes from Akhigbe to John Goodell was announced a mere two months before revelation of the RIF by the University. Prior to May of 2020 John Goodell had taught International

Banking and International Business Finance, two courses that were not going to be offered as frequently from Fall 2020 due to lower enrollments.

23. The RIF Individual Rationale/Criteria for Akhigbe, a copy of which is attached hereto as Exhibit 2, fails to show how his selection for the RIF will impact the University's diversity and affirmative action objectives.

### Professor Bhanu Balasubramnian

24. Bhanu Balasubramnian joined the University's Department of Finance in July of 2011 as an Assistant Professor with tenure-track. She was promoted to a tenured Associate Professor position in August of 2017.

25. In July of 2020 Balasubramnian was one of nine faculty in the Department of Finance.

26. Balasubramnian was one of two Asian faculty members in the Department of Finance and one of three foreign-born faculty in that Department. The Department of Finance consisted of six white and three non-white faculty, including Balasubramnian.

27. In the CBA, Balasubramnian was one of sixteen Asian faculty and 21 foreign-born out of 52 faculty in the College.

28. Balasubramnian had taught Financial Institutions and Markets, a core course for all finance majors since she was hired in 2011.

29. Balasubramnian also had taught Financial Statement Analysis, a core course for Financial Management majors, since 2012. She was the only faculty member who taught this course at the time the RIF was announced.

30. Beginning in the Fall of 2017, Balasubramnian also taught Principles of Finance, a core course taken by all business majors.

31. At numerous times during her employment with the University Balasubramnian asked Thomson for the opportunity to teach summer classes. Thomson never gave Balasubramnian permission to do so but did assign up to two (2) summer classes regularly to white faculty: Drs. Eric Brisker, Suzanne Gradisher and Jill Bisco.

32. Balasubramnian was paid a significantly lower compensation relative to American-born, White faculty, who were recruited later (Drs. Eric Brisker and Jill Bisco).

33. The RIF Individual Rationale/Criteria provided to Balasubramnian after her termination, a copy of which is attached hereto as Exhibit 3, fails to show how her selection for the RIF will impact the University's diversity and affirmative action objectives.

## Defendant's RIF Guidelines

34. In the late spring or early summer of 2020, the University distributed Reduction in Workforce Manager Guides ("Manager Guides") to those University administrators who were tasked with determining which faculty to recommend for the RIF. A copy of this Guide is attached hereto as Exhibit 4.

35. The purpose of the Manager Guide is to assist the administrators with planning for the RIF and informs them that it is their responsibility to

carefully plan faculty reductions to balance business and HR considerations, including impact on diversity and affirmative action objectives. *See* Exh. 4, p. 4.

36. The Guide makes numerous planning recommendations to the administrators who are determining the RIF selections, including the impact of each selection on diversity/affirmative action objectives and faculty length of service. Exh. 4, p. 4.

37. The Manager Guide also specifies that the RIF is not to be used as a substitute for performance management or corrective action. Exh. 4, p. 4.

### CBA's Arbitrary Reduction in Force Process

38. Thomson and Susan Hanlon, Dean of the College of Business Administration, both white and American-born, declined to use the RIF Guidelines provided to them by the University.

39. Instead of following the RIF Guidelines, Thomson and Hanlon decided to rank employees in the College by determining each employee's Total Impact Score and terminating those with the lowest Scores.

40. The CBA on several occasions has described its approach to the Total Impact Scores used to make the RIF selections as "holistic," and has no documents which show how it determined what factors would make up the Total Impact Score. Defendant also has not documents showing the data which was considered in determining various rankings in the Total Impact Scores or the calculations used to determine the various entries.

41. No analysis similar to the Total Impact Score had been used to rank faculty in the Department of Finance while Akhigbe and Balasubramnian had been employed by the University. Prior to the RIF, the Professors in the University's Department of Finance were reviewed annually. The categories considered in these annual reviews were Research and Teaching, both weighted at 45%, and Service, which was weighted at 10%.

42. The Total Impact Scores purportedly analyze seven factors in deciding who from the Department of Finance to select for the RIF. In addition to Research, Teaching and Service, the CBA considered Service Adjustment, Critical Adjustment, NTRGP (potential to generate revenue through fundraising, grants, etc.) and TIHGP (whether the faculty member teaches in a potentially high growth program).

43. The Total Impact Score for the University's Department of Finance ranked Akhigbe 7th out of 9 Professors in the Department and Balasubramnian 9th out of 9. A copy of the Total Impact analysis for the College's Department of Finance is attached hereto as Exhibit 5.

44. The Total Impact Score metrics and the data used to determine a faculty member's Total Impact Score were subjective and random and were manipulated by the University to rank white, American born professors higher than professors of a minority race and non-American national origin.

45. For example, Service is considered in two (2) separate columns in determining Total Impact. Therefore, a professor who was highly ranked

in this area could receive an unwarranted higher ranking because he or she received double credit for the exact same thing. Likewise, a professor who is ranked low in the Service category could be doubly penalized. The University has no written rationale for its use of this procedure.

46. Moreover, the Service scores awarded to the Professors in the Department of Finance are completely arbitrary. For example, Jinjing Wang received a low score for Service in one column, but a high score in the Service Adjustment column. Akhigbe, in turn, was ranked higher than Wang in one service column, but received a low score in the Service Adjustment column.

47. Akhigbe and Balasubramnian received low scores in the TNRGP column, purportedly used to rank a faculty member's potential to generate revenue through fund raising, grants or the development/execution or executive education. These low scores given to the Plaintiffs for TNRGP, however, are unsupported, unwarranted and arbitrary.

48. The Critical Adjustment column purportedly considers how critical the courses taught by faculty member are to the CBA. These scores for the Department of Finance also are illogical, especially because the University had decided two (2) months prior to the RIF to transfer required classes away from Akhigbe. The sudden and very recent transfer of required courses from a black, foreign-born faculty member to a white, American-

born faculty member was done in anticipation of the RIF and to be able to more easily justify Akhigbe's selection for the RIF.

49. The Plaintiffs are accorded scores of "0" in the two categories which were newly created by Thomson and Hanlon for the RIF selections. All the white, American-born faculty received higher scores in the brand new categories.

50. At the time of the RIF, the Plaintiffs were generally considered to be the top research faculty in the Department of Finance. Therefore, because the CBA's Total Impact Scores inexplicably place a low value on research, the Plaintiffs were penalized. The University's discounting of research in calculating Total Impact Scores was done intentionally so that white, American-born professors would be ranked higher than on-white, foreign-born professors.

51. The teaching scores accorded to Akhigbe in the Total Impact analysis are not supported by the teachings scores he had received in two prior academic years. Akhigbe's teaching score was 3 out of 5 2018-19 and 4 in 2019-20.

52. The Total Impact Scores of Akhigbe and Balasubramnian would have been higher than white Professors born in the United States if the University would have ranked the faculty in the Department of Finance objectively.

53. The haphazard manner in which the Total Impact Scores were created, calculated and used by the Department of Finance tend to show that that the University determined which faculty would be selected for the RIF prior to creating and calculating the Total Impact Scores.

## CBA Failed to Follow Explicit HR Guidelines

54. The Total Impact Scores used by the Department of Finance to determine which faculty to terminate did not follow the University's HR Guidelines, as those Scores fail to consider any impact on diversity and affirmative action objectives. The Total Impact Scores also factored in performance reviews despite the specific admonition in the Manager Guides not to do so.

55. The Manager Guide also requires that the administrators complete a Position Abolishment Rationale to the University's HR Department. That Rationale should explain numerous things, including if the decision impacts the University's diversity and affirmative action goals.

56. The Rationales completed by the University for both Plaintiffs fails to mention how the decision to select them for the RIF impacts the University's diversity and affirmative action goals.

57. The CBA failed to follow the University's direct and specific guidelines in determining which faculty to select for the RIF.

## Statistics Show Evidence of Discrimination Against Non-White and Foreign-Born Faculty

58. When a four-fifth disparate ratio is employed to analyze the selection of non-white faculty from the Department of Finance for the RIF, the ratio is 2/3 or 66.67%, which is a significant finding indicating that non-whites are more likely to be selected for the RIF.

59. When a four-fifth disparate ratio employed to analyze the selection of foreign-born faculty from the Department of Finance for the RIF, the ratio

also is 2/3 or 66.67%, which is a significant finding indicating that foreign-born faculty members are more likely to be selected for the RIF.

60. When a four-fifth disparate ratio is employed to analyze the selection of non-white faculty from the CBA for the RIF, the ratio is 5/18 or 27.78%, which is a significant finding indicating that non-white faculty are more likely to be selected for the RIF.

61. When a four-fifth disparate ratio is employed to analyze the selection of foreign-born faculty from the CBA for the RIF, the ratio is 6/21 or 28.57%, which is a significant finding indicating that foreign-born faculty are more likely to be selected for the RIF.

## COUNT ONE
## Disparate Treatment Race Discrimination
## in Violation of Title VII, 42 U.S.C. §2000e-2

62. Plaintiffs incorporate by reference each and every allegation in paragraphs 1 through 61 of this Complaint as if fully set forth herein.

63. Plaintiffs, who are racial minorities, Black and Asian, are members of a protected class under Title VII.

64. The University's actions, as described herein, resulted in each Plaintiff suffering an adverse employment action because of race, in violation of Title VII. The University failed to follow its own RIF Guidelines and used arbitrary and subjective standards in selecting faculty for the RIF. As a result, racial bias occurred with the RIF selections in the Department of

Finance, as shown by the statistics showing that non-whites are more likely to have been terminated.

65. The University's actions directly benefited white Professors, who were not subjected to the 2020 RIF.

66. The University's various acts taken in relation to the Plaintiffs' RIF constitute unlawful employment practices because of race in violation of Title VII.

## COUNT TWO
### Disparate Treatment National Origin Discrimination in Violation of Title VII, 42 U.S.C. §2000e-2

67. Plaintiffs incorporate by reference each and every allegation in paragraphs 1 through 66 of this Complaint as if fully set forth herein.

68. Plaintiffs, who are from Nigeria and India, are members of a protected class under Title VII.

69. The University's actions, as described herein, resulted in each Plaintiff suffering an adverse employment action because of national origin, in violation of Title VII. The University failed to follow its own RIF Guidelines and used arbitrary and subjective standards in selecting faculty for the RIF. As a result, national origin bias occurred with the RIF selections in the Department of Finance, as shown by the statistics showing that foreign-born faculty are more likely to have been terminated.

70. The University's actions directly benefitted Professors who were born in the United States, who were not subjected to the 2020 RIF.

71. The University's various acts taken in relation to the Plaintiffs' RIF constitute unlawful employment practices because of national origin in violation of Title VII.

WHEREFORE, Plaintiffs demand that this Court grant them judgment against the University and the following relief:

A) Judgment against the University ordering reinstatement and all back pay and benefits lost due to the unlawful Reduction in Force;

B) Award each Plaintiff compensatory damages based upon the trial of this matter;

C) Award reasonable attorney's fees and costs incurred to prosecute this action;

D) Award punitive damages against the University;

E) Award pre-judgment interest on all back pay and benefits and post-judgment interest on any judgment granting other damages or back pay and benefits;

F) Any other relief this Court deems necessary and just.

Respectfully submitted,

COHEN ROSENTHAL & KRAMER LLP

/s/ Ellen M. Kramer
Ellen M. Kramer #0055552
emk@crklaw.com
Joshua R. Cohen #0032368
jcohen@crklaw.com
3208 Clinton Avenue
Cleveland, Ohio 44113
216-815-9500 [Phone]
216-781-7956 [Fax]
www.crklaw.com

## JURY DEMAND

The Plaintiffs demand a trial by jury on each claim that may be so tried.

/s/ Ellen M. Kramer