**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| AIGBE AKHIGBE, Ph.D., *et al.*, | ) | Case No. 5:22-CV-01990 |
| | ) | |
| Plaintiffs, | ) | JUDGE PEARSON |
| | ) | |
| v. | ) | MAG. JUDGE HENDERSON |
| | ) | |
| UNIVERSITY OF AKRON, | ) | |
| | ) | |
| Defendant. | ) | |

---

**MOTION FOR SUMMARY JUDGMENT OF**
**DEFENDANT UNIVERSITY OF AKRON**

---

DAVE YOST (0056290)
Attorney General of Ohio

Drew C. Piersall (0078085)
ZASHIN & RICH CO., L.P.A.
17 South High Street, Suite 900
Columbus, OH 43215
Telephone: (614) 224-4411
Facsimile: (614) 224-4433
dcp@zrlaw.com

Sarah J. Moore (0065381)
ZASHIN & RICH CO., L.P.A.
950 Main Avenue, 4th Floor
Cleveland, OH 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618
sjm@zrlaw.com

*Attorneys for Defendant University of Akron*

## MOTION FOR SUMMARY JUDGMENT
## OF DEFENDANT UNIVERSITY OF AKRON

Pursuant to Federal Rule of Civil Procedure 56, Defendant University of Akron moves for summary judgment on all claims Plaintiffs Aigbe Akhigbe and Bhanu Balasubramnian asserted against it: race discrimination, national origin discrimination, and retaliation under Title VII of the Civil Rights Act of 1964. As explained in the memorandum in support that follows, no material issues of disputed fact exist, and Defendant is entitled to judgment as a matter of law on Plaintiffs' claims.

Respectfully submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
ZASHIN & RICH CO., L.P.A.
17 South High Street, Suite 900
Columbus, OH 43215
Telephone: (614) 224-4411
Facsimile: (614) 224-4433
*dcp@zrlaw.com*

Sarah J. Moore (0065381)
ZASHIN & RICH CO., L.P.A.
950 Main Avenue, 4th Floor
Cleveland, OH 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618
*sjm@zrlaw.com*

*Attorneys for Defendant University of Akron*

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

MEMORANDUM IN SUPPORT .......................................................................................... 1

I.      Introduction ................................................................................................................ 1

II.     Statement of Facts ..................................................................................................... 2

A.     Plaintiffs' Employment Histories ............................................................................ 2

     B.    UA's Dire Financial Circumstances ............................................................ 3

     C.    Thomson Recommends Plaintiffs' Two Positions for Elimination in the RIF ............ 4

     i.     RIF Criteria .................................................................................................. 5

     ii.    RIF Criteria Applied to Akhigbe ............................................................... 8

     iii.   RIF Criteria Applied to Balasubramnian .................................................. 11

     D.    UA Eliminates 96 Bargaining-Unit Faculty Positions, Including Plaintiffs' ............ 13

III.    Law & Argument ...................................................................................................... 14

     A.    Plaintiffs' Race and National Origin Discrimination Claims Fail .............................. 14

     1.    Plaintiffs Cannot Establish the Fourth Prong of their *prima facie* Cases .................. 14

     2.    Plaintiffs Cannot Demonstrate That UA's Legitimate Non-Discriminatory Reasons for Their RIFs are Pretextual ................................................................................. 17

     B.    Plaintiffs' Retaliation Claims Fail ............................................................... 23

IV.    Conclusion ............................................................................................................... 27

CERTIFICATE OF SERVICE ............................................................................................. 29

# TABLE OF AUTHORITIES

**Cases**

*Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir.), *cert. denied*, 498 U.S. 878 (1990)... 14, 15

*Beck v. Buckeye Pipeline Servs.*, 501 Fed. Appx. 447 (6th Cir. 2012)......................................... 20

*Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568 (6th Cir. 2022) .................................... 26

*Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890 (6th Cir. 1997) ................................................. 15

*Carter v. Univ. of Toledo*, 349 F.3d 269 (6th Cir. 2003) ............................................................. 19

*Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268 (2001)................................................................ 26

*EEOC v. Lucent Technologies, Inc.*, 226 Fed. Appx. 587, 591 (6th Cir. 2007) .......................... 19

*Equal Emp't Opportunity Comm'n v. New York Times Broad. Serv., Inc.,* 542 F.2d 356 (6th Cir. 1976) ..................................................................................................................................... 17

*Escher v. BWXT Y-12, LLC*, 627 F.3d 1020 (6th Cir. 2010) ....................................................... 25

*Harper v. City of Cleveland*, N.D. Ohio Case No. 1:16-cv-2972, 2018 U.S. Dist. LEXIS 76749 (N.D. Ohio May 7, 2018)....................................................................................................... 19

*Henning v. City of Jackson*, 2023 U.S. App. LEXIS 14813 (6th Cir. June 14, 2023)................. 26

*Heyward v. CDM Smith, Inc.*, 2015 U.S. Dist. LEXIS 103314, *9 (E.D. Tenn. Aug. 5, 2015)... 16

*Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999)......................................... 18

*Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014) ........................................................ 23

*Li v. Univ. of Akron*, N.D. Ohio Case No. 5:21-cv-2277, 2023 U.S. Dist. LEXIS 108342 (N.D. Ohio June 22, 2023)................................................................................................................ 15, 16

*Mansfield v. City of Murfreesboro*, 706 F. App'x 231 (6th Cir. 2017) ....................................... 23

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) .................................................... 14, 23

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008)................................................. 26

*Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018)............................................... 14, 16

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599 (6th Cir. 2019)......................................... 23

*Simpson v. Midland-Ross*, 823 F.2d 937 (6th Cir. 1987).............................................................. 16

*Slapak v. Tiger Management Group, LLC*, 594 Fed. Appx. 290, 295 (6th Cir. 2014)................. 16

*St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) ......................................................... 18

*Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016)..................................... 14

*Thompson v. Fresh Prods.,* 985 F.3d 509 (6th Cir. 2021) ............................................... 16, 18, 19

*Tillotson v. Manitowoc Co.*, 727 Fed. Appx. 164 (6th Cir. 2018) ............................................... 20

*Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)................................................... 23

*Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510 (6th Cir. 1991) ....................................... 15

**Statutes**

Title VII of the Civil Rights Act of 1964................................................................................. i, 23

**Rules**

Fed. R. Civ. P. 56 ............................................................................................................................ i

**MEMORANDUM IN SUPPORT**

I.      <u>**Introduction**</u>

The COVID-19 pandemic had a colossal impact on Defendant, the University of Akron ("UA"), resulting in a forecasted $65 million structural budget deficit in UA's 2020-2021 fiscal year ("FY 2021")  (Ex. X, p. 22; Akhigbe Dep. 16, 18-19; Balasubramnian Dep. 116). Consequently, on July 15, 2020, the UA Board of Trustees approved the elimination of 178 positions through a campus-wide reduction in force ("RIF").  (Exs. AA (non-faculty positions) and BB (bargaining faculty positions)).  The RIF included UA's abolishment of 96 bargaining unit faculty positions, including Plaintiffs' positions, pursuant to Article 15, titled *"Retrenchment,"* of the collective bargaining agreement ("labor contract") between UA and the American Association of University Professors ("AAUP").  (Ex. BB).

At the time of UA's RIF decision on July 15, 2020, Plaintiffs were faculty members in UA's College of Business Administration ("College") in the Department of Finance ("DOF"). (Akhigbe Dep. 19-20).  James Thomson served as the Chair of the DOF at the time of the RIF.  He reported to interim College Dean Susan Hanlon. (Akhigbe Dep. 20).

Thomson recommended Akhigbe's position for inclusion in the RIF for simple and indisputable reasons: (1) he had the lowest teaching score in the DOF; (2) he had no critical expertise and carried the lowest teaching load in the DOF due to an endowed chair; and (3) he did not teach any required classes in the Master in Business Administration ("MBA") program, the College core, or any finance majors.  (Ex. G).  Moreover, Akhigbe had the highest salary of any faculty member not only in the DOF and College, but in the entire University to the tune of $318,571.50, inclusive of benefits.  (Thomson Dep. 126; Ex. G).

After the UA Provost advised the College that further cuts needed to be made for budgetary

reasons, Thomson then recommended Balasubramnian's position for inclusion in the RIF for similarly straightforward reasons: (1) she was one of the two lowest rated teachers in DOF based on merit review scores;  (2) she had the lowest merit score for service in the DOF; and (3) she was not seen as integral to the future of the two programs with the highest growth potential in the DOF (Risk Management and Insurance and Financial Planning).  (Ex. SS).  A total of nine College faculty members were subject to the RIF.  There is no genuine, material dispute concerning UA's rationales for abolishing Plaintiffs' positions.

Plaintiffs contend the RIF of their respective positions constituted race discrimination, national origin discrimination, and retaliation.  Plaintiffs cannot satisfy the heightened evidentiary standard required in a RIF *prima facie* case to demonstrate that UA **intentionally** chose to eliminate their positions based on their race and/or national origin and/or in retaliation for purported protected activity.  Even if such evidence existed, UA had legitimate non-discriminatory and non-retaliatory business reasons for its decisions and no evidence of pretext exists.  UA is entitled to summary judgment as a matter of law on all of Plaintiffs' claims.

## II.    **Statement of Facts**

### A.    **Plaintiffs' Employment Histories**

Akhigbe was a tenured faculty member in UA's College of Business Administration's Department of Finance from August 2000 until his position was eliminated as part of UA's RIF in July 2020.  Akhigbe elected to retire from UA effective August 21, 2020.  (ECF #25, Joint Stip. ¶3, 5).  Akhigbe was hired as the Moyer Endowed Chair of Finance and held this title during the entirety of his employment.  (Akhigbe Dep. 27; Ex. A).[1]  As part of his Chair responsibilities,

---

[1] Defendant conducted the depositions of Akhigbe (ECF#20) and Balasubramnian (ECF#21).  Plaintiff conducted the depositions of  Susan Hanlon (ECF #22), Rex Ramsier (ECF #23), and James Thomson (ECF #24).  Citations to deposition transcripts and associated exhibits filed with the Court are cited herein as

Akhigbe enjoyed a reduced teaching load in exchange for an increased research expectation. (Akhigbe Dep. 34-36; Ex. A).  He was the highest paid faculty member in the entire University. (Thomson Dep. 126).  His nine-month 2019-20 academic year salary was $236,351, and he received an additional $27,000 summer stipend.  (Akhigbe Dep. 97-98). Inclusive of benefits, Plaintiff's total compensation was $318,571.50.  (Joint Stip. ¶21).

Balasubramnian was hired as a faculty member in August 2011 as a tenured-track Assistant Professor in the DOF. (Joint Stip. ¶6).  Balasubramnian obtained tenure in 2017 and was promoted to Associate Professor. Plaintiff worked as an Associate Professor until her separation as part of the University's Reduction in Force in 2020.  Balasubramnian's separation from the University was effective August 21, 2020.  (Joint Stip. ¶8).  She earned $156,573 at the time of her separation. (Balasubramnian Dep. 120; Ex. TT). Inclusive of benefits, Balasubramnian's total compensation was $201,979.17.  (Joint Stip. ¶22).

### B.    UA's Dire Financial Circumstances

Although UA had utilized its reserves to address the structural deficit in past years, the financial impact of the COVID-19 pandemic created a catastrophic circumstance – a dire and immediate $65-million structural budget deficit for FY 2021 - that could not be addressed by using UA's cash reserves and that required significant multi-million expenditure reductions.  (Ex. X, pp. 22-23).

By May 6, 2020, less than two months after Governor DeWine issued Executive Order 2020-01(D) declaring a state of emergency in Ohio due to COVID-19, *UA projected the $65-million budget deficit for FY21. Id.* For context, UA had to reduce its operating budget by approximately 20% and realize that savings to balance its finances by the end of FY 2021. *Id.*

---

"Deponent Last Name, Dep. __," with referenced page numbers of the transcript. Citations to associated deposition exhibits are cited herein as "Ex. __."

UA's credit rating was at risk, "the loss of which could imperil the viability of the University." (Ex. X, p. 23).

UA's Board of Trustees took drastic action in response, including: (1) Resolution 5-1-20 (Consolidation of 11 colleges to 5 colleges) (Ex. Z); (2) Resolution 5-5-20 (Reduction in FY21 compensation to non-bargaining unit staff, contract professionals, and senior administrators; (3) Resolution 5-6-20 (Increase to employee monthly health care premium contributions for non-bargaining staff, contract professionals, and senior administrators); (4) Resolution 5-7-20 (Elimination of all retiree dependent health insurance benefits for non-bargaining unit employees); (5) Resolution 6-14-20 (Reduction of FY21 compensation of non-bargaining unit faculty and academic administrators with faculty rank); (6) Resolution 6-15-20 (Increase to employee monthly health care premium contributions for non-bargaining unit faculty and academic administrators with faculty rank); (7) Resolution 7-6-20 (Elimination of 82 non-bargaining unit positions campus-wide) (Ex. AA); and (8) Resolution 7-7-20 (Elimination of 96 AAUP bargaining unit positions campus-wide, including the positions held by Plaintiffs) (Ex. BB). A summary of the pre-RIF actions taken by UA to reduce its budget is contained in both Exhibits AA and BB.

### C.    Thomson Recommends Plaintiffs' Two Positions for Elimination in the RIF

In Spring 2020, UA Provost John Wiencek directed that all academic units, including the College, examine their operating budgets and recommend a revised budget for FY 2021 that would result in an approximate 30% budget reduction over the previous fiscal year.  (Thomson Ex. 12, ¶3).  At the time of the RIF, personnel costs constituted the largest expense in the College.  (*Id.* at ¶6).

In May 2020, Hanlon and Thomson learned that UA was contemplating a RIF.   (Hanlon Dep. 7, Thomson Dep. 95).  On May 27, 2020, Hanlon emailed the College's leadership team,

4

which was referred to as the "Strategic Initiative Team," and asked them to review their respective departmental faculty and consider what positions would be the most likely to be eliminated in the event of a RIF.  (Hanlon Dep. 8; Hanlon Ex. 1).

The Strategic Initiative Team was comprised of Hanlon, Thomson (Chair of Finance), Steven Ash (Chair of Management), Sucharita Ghosh (Chair of Economics), Deborah Owens (Chair of Marketing) and Li Wang (Chair of Accounting).  (Joint Stip. ¶16).  This Team was responsible for identifying the RIF criteria that would be utilized by the College.  (Thomson Dep. 11-12, 25-26; Hanlon Dep. 11-12).  Once the RIF criteria were developed (as explained in greater detail below), the Departmental Chairs then applied the criteria and assessed each faculty member in their respective Departments.  (Thomson Dep. 26, 36).  Departmental chairs conducted the initial evaluation and then they were adjusted based on conversations with the Strategic Initiative Team.  (Thomson Dep. 28). No one assisted Thomson with initial DOF assessments.  (Thomson Dep. 72). The Strategic Initiative Team reviewed and discussed these initial assessments to reach a final determination.  Thomson's initial determinations were accepted by the Team – there were no edits. (Thomson Dep. 73).[2]

### i.    RIF Criteria

As one might imagine, there was "a lot of discussion" by the Team regarding the RIF criteria to be utilized.  "People were trying to look at the data different ways to come up with the fairest process possible and to understand, whenever you make a decision, that could impact things." (Thomson Dep. 45-46).  The RIF process was done "to protect our accreditation, to ensure that our programs would be viable, to enhance our possibility of growing back out of it [the

---

[2] Although this case focuses on bargaining unit faculty members, it bears mentioning that four non-faculty College members were also laid off.  This included a graduate academic adviser, a budget analyst, and two secretarial positions.  (Hanlon Dep. 32-33; Hanlon Ex. 4).

budgetary shortfall], and **basically we needed students and we needed revenues**." (Thomson Dep. 47).

The Team utilized the traditional merit evaluation scores of (1) teaching, (2) research and (3) service as the starting point for RIF criteria, "and then we included factors that captured other dimensions that we thought would be necessary for the college to survive post-RIF." (Thomson Dep. 10). An average of merit review scores for academic years 2018-19 and 2019-20 was utilized for these first three criteria. (Thomson Dep. 21). In the DOF, the merit review scores for each faculty member's annual evaluation were weighted: teaching was 45%, research was 45%, and service was 10%. (Thomson Dep. 22). The determination was made to utilize "unweighted" scores for the RIF because "[weighted scores] contained less information than the unweighted scores." (Thomson Dep. 23). "We didn't want to lose information. We wanted to make decisions using the full amount of information because our objectives were slightly different than the objectives that are in the merit documents, which are driven by a collective bargaining agreement. (Thomson Dep. 24). The merit review process is "heavily formulaic" and "driven by the collective bargaining agreement." (Thomson Dep. 26-27).

In addition to teaching, research and service, the College utilized the additional RIF criteria categories of:

(4) service adjustment;

(5) critical adjustment;

(6) non-tuition revenue generation potential ("NTRGP"); and,

(7) teaches in high growth program ("TIHGP").

(Hanlon Dep. 51-52; Hanlon Ex. 18). "They were all new in terms of an evaluation going forward. They weren't new necessarily to the college, because these were all things that were inherent in

the strategic planning." (Thomson Dep. 36).  Faculty members were awarded either a zero or a one in each of the four categories, which would then be added to the teaching, research and service average scores for the two years in question to arrive a "total impact score." (Thomson Dep. 72). "[T]he reason we went with 1-0 is because it's very difficult to measure qualitatively. … These were the heavy contributors, these were the lighter contributors." (Thomson Dep. 29).

The Team utilized "service adjustment" to capture the "intensity" and "impact" of the service performed by a particular faculty member.  (Hanlon Dep. 25).  Intensity and impact were measured by the amount of money brought in, the impact on students, recruitment of students, and visibility to the college.  (Hanlon Dep. 25-26).  This service adjustment score was different than the service score utilized in merit reviews because the merit review scores "don't capture intensity of activity or fully capture activity across the board."  (Thomson Dep. 27). Faculty members who were heavy service contributors received one point in this category – average or lower contributors received a zero.  (Thomson Dep. 28).

"Critical adjustment" was utilized to determine whether a faculty member was critical to the survival of a program.  (Hanlon Dep. 27; Thomson Dep. 30).  The Team analyzed what courses were taught by a particular faculty member, if other faculty members taught that particular course, and whether the courses were required versus elective. (Hanlon Dep. 27).

Non-tuition revenue generation was identified as part of the College's strategic planning as early as 2018-19.  (Thomson Dep. 11; Hanlon Dep. 11-13).  NTRGP was a recognition that additional revenues were needed until enrollment returned to previous levels.  (Thomson Dep. 11). In order for the College to survive it needed two things:  money and students.  (Hanlon Dep. 12). Non-tuition revenue generation was identified as part of that strategic planning process due to pre-RIF declining enrollment.  (Thomson Dep. 10-11).  The NTRGP factor measured a faculty

member's ability to obtain money from non-tuition sources, such as executive training, conference advisory boards, grants, and the like.  (Hanlon Dep. 13, 28; Thomson Dep. 32-33).

The College identified certain high growth programs in its 2018-19 strategic planning. (Thomson Dep. 35-36; 84-85; Hanlon Dep. 29).  Similar to NTRGP, certain programs were identified as part of the effort to rebuild revenues due to declining enrollment. (Thomson Dep. 34-35).  Faculty members were awarded a "one" in the TIHGP category if they taught in such a program, and a "zero" if they did not.

Before applying the RIF criteria to faculty members, and in accordance with the goal of maintaining accreditation, the College first identified three faculty members for inclusion in the RIF who were "out of status."  (Thomson Dep. 47-48; Thomson Ex. 5, p. 2).  This meant that the faculty members "did not meet [the Association to Advance Collegiate Schools of Business] scholarship requirements for their position." (Thomson Dep. 47).   In the event non-accredited faculty were retained following a 30% faculty reduction, this would create plain accreditation issues.  *Id.*  Accordingly, Drs. Conrad (Accounting), Figler (Management), and Orr (Marketing) were the first faculty members identified for inclusion in the RIF. (Thomson Dep. 48).

The Total Impact Scores for DOF faculty can be found at Ex. U and are contained below:

| Rank | Name | AACSB Faculty Classification[1] | Total impact[1] | Service Adj[2] | Critical Adj[3] | NTRGP[4] | TIHGP[5] | Merit Scores from past 2 merit evauations[6] | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Research | Teaching | Service |
| Asst Prof | Bisco,Jill M | SA | 17.7750 | 1 | 1 | 1 | 1 | 3.78 | 5.00 | 5.00 |
| Asst Prof Pract | Mulholland PhD,Barry S | PA | 17.1000 | 1 | 1 | 1 | 1 | 4.10 | 4.00 | 5.00 |
| Assoc Prof | Goodell,John W | SA | 16.5000 | 1 | 0 | 1 | 0 | 5.00 | 5.00 | 4.50 |
| Assoc Prof | Brisker,Eric R | SA | 15.7150 | 0 | 1 | 1 | 0 | 4.22 | 5.00 | 4.50 |
| Assoc Prof | Newman,Melinda L | SA | 14.2600 | 0 | 1 | 1 | 0 | 2.76 | 5.00 | 4.50 |
| Asst Prof | Wang,Jinjing | SA | 13.9450 | 1 | 1 | 0 | 1 | 2.45 | 5.00 | 3.50 |
| Professor | Akhigbe,Aigbe | SA | 12.5000 | 0 | 0 | 0 | 0 | 5.00 | 3.50 | 4.00 |
| Assoc Prof | Gradisher,Suzanne M | SA | 12.4850 | 0 | 0 | 0 | 1 | 2.49 | 5.00 | 4.00 |
| Assoc Prof | Balasubramnian,Bhanu | SA | 12.4800 | 0 | 0 | 0 | 0 | 4.48 | 4.50 | 3.50 |

### ii.    RIF Criteria Applied to Akhigbe

Akhigbe was the first faculty member identified in the first draft of the DOF RIF projections on June 10, 2020.  (Thomson Dep. 48; Thomson Ex. 5).  In comparison to other faculty

members in the DOF, Akhigbe was the highest paid with the lowest teaching load.  (Thomson Ex. 12, ¶13, 16).  Akhigbe received a 5.0 out of 5.0 in research, 3.50 out of 5.0 in teaching (he received a 3.0 teaching score in 2018-2019 and 4.0 in 2019-2020), and a 4.0 out of 5.0 in service.  He did not receive any points in the four additional categories of Service Adjustment, Critical Adjustment, NTRGP or TIHGP.  (Ex. U).  Akhigbe was aware that he had the lowest teaching score in the entire DOF, but chalks it up to Thomson "deliberately reducing his teaching score."  (Akhigbe Dep. 120).  While Akhigbe never challenged teaching or research scores, he had challenged his service score on one occasion that resulted in it changing from 3.0 to 4.0.  (Akhigbe Dep. 118).  Notably, the service score utilized for Akhigbe reflected this change (i.e., the higher 4.0 score had been used for Akhigbe's service score).

As noted earlier, the service score and service adjustment score reflected different areas of assessment and were not the same. (Thomson Dep. 27).  Akhigbe did not receive a point in service adjustment because he was not active on college committees, faculty senate, and/or had important roles on department/college committees.  (Thomson Dep. 28-29).

Akhigbe did not receive a point in critical adjustment because his potential loss did not impair a program.  (Thomson Dep. 78).  By way of differentiation, Jill Bisco received a point because she was one of only two faculty members in risk management and insurance.  *Id.*  Barry Mulholland also received a point because he was the only faculty member in financial planning, and Eric Brisker was the only faculty member teaching analytics.  *Id.*

Akhigbe did not receive a point in NTRGP because:  he raised minimal money for the College.  At the time of the RIF, Akhigbe had been awarded four grants: one in 2013 for $3,500 (along with one other faculty member), one in 2014 for $4,000 (along with Balasubramnian), one in 2015 for $4,000 (along with Balasubramnian), and one in 2016 for $3,500 (along with two other

faculty members, including Balasubramnian).   (Akhigbe Dep. 102-03).  He participated in one educational program offered to private corporations, which involved high school teachers enrolling for one of his courses.  (Akhigbe Dep. 172).  Akhigbe's NTRGP was clearly low, as he brought in minimal external funds to the DOF.

Akhigbe did not receive a point in TIHGP because the only two high growth program areas in the DOF were: 1) risk management and insurance, and 2) financial planning.  These areas were identified as the two high growth areas in the DOF in the Department's strategic plan.  (Akhigbe Dep. 232).   Faculty members had input into the creation of this plan. (Akhigbe Dep. 212; Balasubramnian Dep. 233).  Akhigbe did not teach in those areas, so he received a score of zero. (Thomson Dep. 85; 140-41).

Further, the elimination of Akhigbe's position would not impair the DOF's ability to offer required courses in the MBA, the College core, or any of the Finance major.  (Thomson Ex. 12, ¶3).  While Akhigbe is qualified to teach some of those courses, all of those courses could be covered with the remaining faculty.  (*Id.* at ¶14).  Further, Akhigbe's teaching performance was the lowest in the entire DOF for the two-year time period at issue. (*Id.* at ¶13).  Accordingly, the notes in the Total Impact Score accurately stated: "Low teaching quality, low course load and teaching ratings.  Does not currently teach MBA course, College course or Finance core classes." (Ex. U).

Thomson, in the Individual Rationale/Criteria (Ex. G), explained the action as follows:

Dr. Akhigbe has an impact factor of 12.5.  The three lowest evaluated faculty members in finance had impact factors of 12.5.  Two of the three were on the RIF list.  He earned the lowest merit raise teaching score in the department.  He has no critical expertise and carries the lowest teaching load in the department due to an endowed chair.  He does not teach any required classes in the MBA, the [College] core, or any finance majors.

### iii.       RIF Criteria Applied to Balasubramnian

After the submission of the first draft of potential RIF selections, the SIT determined that the other Departments in the College could not sustain further cuts, and that the Departments of Finance and Marketing would absorb further faculty cuts in the event reductions were necessary. (Thomson Dep. 93-94).   On June 23, 2020, that contingency occurred: the Provost's Office instructed the College to include two more positions in the RIF to meet UA's budgetary targets. (Joint Stip. ¶20).  The position occupied by Balasubramnian was then selected for inclusion in the RIF, along with Bill Hauser (Caucasian American) from Marketing. (Hanlon Dep. 55-58; Hanlon Ex. 12; Thomson Dep. 93-94; Balasubramnian Dep. 138-39).[3]

Balasubramnian received a 4.48 out of 5.0 in research, 4.50 out of 5.0 in teaching (she received a 5.0 teaching score in 2018-2019 and 4.0 in 2019-2020), and a 3.50 out of 5.0 in service. Like Akhigbe, she did not receive any points in the four additional categories of Service Adjustment, Critical Adjustment, NTRGP or TIHGP.    (Ex. U).  Balasubramnian believes she received lower teaching scores from both Thomson as well as in student evaluations due to implicit bias against people of color and people of foreign origin.  (Balasubramnian Dep. 105).  However, Balasubramnian  never gave any notice to College management regarding these alleged implicit biases.  (Balasubramnian Dep. 109).

Balasubramnian did not receive a point in service adjustment because he was not active on college committees, faculty senate, and/or had important roles on department/college committees.

---

[3] As can be seen from the Total Impact Scores, the scores for Akhigbe, Balasubramnian and Gradisher were close: Akhigbe's score was 12.5, Balasubramnian's score was 12.48, and Suzanne Gradisher's score was 12.485.  (Ex. U).  Thomson did not RIF Gradisher's position because she was integral to the Financial Planning Program, which is the fastest growing program in the DOF.  Further, Gradisher possesses a Juris Doctorate and teaches the undergraduate business law class.  She also teaches Estate and Financial Planning, which is a course critical to the Financial Planning Program.  Gradisher is the only DOF faculty member who can teach these courses.  (Thomson Dep. 131; Thomson Ex. 13, ¶15-17).   It is not in dispute that Gradisher was the only remaining business law faculty member post-RIF.  (Balasubramnian Dep. 113).

(Thomson Dep. 28-29).

Balasubramnian did not receive a point in critical adjustment because her potential loss did not impair a program.  (Thomson Dep. 78).

Balasubramnian did not receive a point in NTRGP because, similar to Akhigbe, her grant activity was limited.  She received a few thousand dollars in grants during her entire employment with UA.  (Balasubramnian Dep. 66-68).  And she did not engage in any executive education. (Balasubramnian Dep. 115).

Balasubramnian did not receive a point in TIHGP because she was not integral to the future of the Risk Management or Insurance and Financial Planning programs. (Thomson Dep. 85; 140-41).

The notes in the Total Impact Score stated: "Solid research record since tenured, bottom 3rd of department in terms of teaching evals with a low service load."  (Ex. U).  Thomson, in the Individual Rationale/Criteria (Ex. SS), explained the action as follows:

> Dr. Balasubramnian rated in the bottom three of finance department faculty using the metrics developed by the college leadership team.  Bhanu is one of the two lowest rated teachers in finance as evidenced by the past two years of merit review teaching scores.  In addition, she received the lowest merit score for service of all tenured faculty in the department.  Finally, Dr. Balasubramnian was not seen as integral to the future of the two growth programs in Finance (Risk Management and Financial Planning).

Thomson was clear that the loss of Balasubramnian would not impact the ability of the DOF to deliver courses to students in financial management (a course historically taught by her). The simple reason is that other professors were qualified to teach that course.  (Thomson Dep. 114; Thomson Ex. 12, ¶17).  With respect to the financial statement analysis class typically taught by Balasubramnian, "all financial management faculty could teach that class."  (Thomson Dep. 117).

### D.      UA Eliminates 96 Bargaining-Unit Faculty Positions, Including Plaintiffs'

On July 15, 2020, UA's Board of Trustees passed Resolution 7-7-20, eliminating 96 faculty positions, including nine positions in the College: two in the Department of Finance, three in the Department of Accounting, two in the Department of Management, and two in the Department of Marketing.  (Joint Stip. ¶11; Akhigbe Dep. 184-87; Balasubramnian Dep. 138-39; Ex. BB).[4]  On July 16, 2020, Hanlon and Thomson conducted telephone conversations with Plaintiffs to inform them that their respective positions had been RIF'ed.  (Akhigbe Dep. 87-88; Balasubramnian Dep. 90-91).  UA issued letters to Plaintiffs on July 17, 2020, notifying them of the elimination of their positions effective August 21, 2020.  (Akhigbe Dep. 104; Ex. E; Balasubramnian Dep. 93-94; Ex. QQ).  Plaintiffs never spoke with Thomson, Hanlon, UA's Human Resources Office, President's office or Provost's Office about **why** their respective positions were included in the RIF.  (Akhigbe Dep. 66-67; Balasubramnian Dep. 91-93).

In response to the RIF notification, Akhigbe voluntarily retired effective August 21, 2020.  (Akhigbe Dep. 153; Ex. P).  A short time later, Thomson and Hanlon recommended to Provost Wiencek that he be granted emeritus status, which was approved.  (Akhigbe Dep. 157; Ex. Q).

After their separations, UA offered Plaintiffs teaching opportunities on a part-time, adjunct faculty basis.  Akhigbe turned it down because he "wasn't up to it."  (Akhigbe Dep. 168).

---

[4] Plaintiffs were members of the AAUP at the time of the RIF.  (Akhigbe Dep. 43; Balasubramnian Dep. 18). As discussed in greater detail below, Article 15 of the labor contract, titled *Retrenchment*, contains the procedure to be used to implement a reduction of faculty positions and includes a catastrophic circumstance (*i.e.* "force majeure") narrow exception to effectuate a RIF.  In effectuating the elimination of 96 bargaining-unit faculty positions in July 2020, UA invoked this narrow exception in Article 15 based on catastrophic circumstances created by the COVID-19 pandemic.  AAUP grieved the decision.  (Ex. W). On September 18, 2020, Arbitrator Jack Buettner rendered a final and binding decision on the issue, holding the University exercised its prerogative appropriately under the narrow exception in Article 15 and implemented the July 15, 2020 RIF correctly under the labor contract. (Ex. X).  Consequently, the 96 Akron-AAUP faculty positions abolished by the RIF (including the positions held by Plaintiffs) remained undisturbed as Arbitrator Buettner held the action taken did not violate the labor contract.  *Id.*

Balasubramnian similarly declined, stating "I will not be teaching any classes on any part-time basis on principle."  (Balasubramnian Dep. 153-54; Ex. XX; Thomson Dep. 145-46).  Thomson also attempted to obtain a visiting research associate position for Balasubramnian, but Thomson was unable to do so.  (Balasubramnian Dep. 155-56; Ex. XX).

III.    **Law & Argument**

   A.    **Plaintiffs' Race and National Origin Discrimination Claims Fail**

      1.    **Plaintiffs Cannot Establish the Fourth Prong of their *prima facie* Cases**

This is not a direct evidence case.  (Akhigbe Dep. 91; Balasubramnian Dep. 75-76).  Accordingly, Title VII race and national origin discrimination claims utilize the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  To establish a *prima facie* discrimination case, a plaintiff must show she was: (1) a member of a protected class; (2) subject to an adverse employment action; (3) qualified for the position; and (4) replaced by a person outside the protected class or treated differently than similarly situated employees outside the protected class.  *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 303 (6th Cir. 2016).

When a RIF is involved, however, the fourth prong of the *prima facie* case includes a heightened burden for a plaintiff to "present additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [her] out … for impermissible reasons." *Barnes v. GenCorp., Inc.*, 896 F.2d 1457, 1465 (6th Cir.), *cert. denied*, 498 U.S. 878 (1990); *see also Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018) (applying heightened burden in Title VII case). According to *Barnes*, such additional evidence is required because "when work force reductions by the employer are a factor in the decision, the most common legitimate reasons for the discharge are the work force reductions." *Barnes*, 896 F.2d at 1465. "The guiding principle [in

14

a RIF case] is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of [her protected class]." *Barnes,* 896 F.2d at 1466.

As this Court observed in *Li v. Univ. of Akron*, N.D. Ohio Case No. 5:21-cv-2277, 2023 U.S. Dist. LEXIS 108342, at *18-19 (N.D. Ohio June 22, 2023):[5]  "The duty to present a *prima facie* case is somewhat heightened in the context of a RIF because, '[a]s long as employers do not act with discriminatory intent, they may eliminate positions in the name of economic necessity or efficiency, even when those positions are held by [persons in a protected class].' *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 517 (6th Cir. 1991). Discharge of a qualified employee within a protected class is not inherently suspicious because it is the nature of a RIF that some 'qualified employees are going to be discharged.' *Brocklehurst v. PPG Indus., Inc.*, 123 F.3d 890, 896 (6th Cir. 1997) (citing *Barnes*, 896 F.2d at 1466)."

UA does not dispute that Plaintiffs meet the first three elements of a *prima facie* case. However, Plaintiffs cannot establish the fourth prong.  Indeed, based on the record, it is not entirely clear how Plaintiffs intend on establishing this element.  They admit that no one at UA uttered ethnic slurs or otherwise made offensive comments to them or in their presence.  (Akhigbe Dep. 91; Balasubramnian Dep. 73-76).  Further, they did not retain an expert to conduct any statistical analyses, or otherwise provide such materials in discovery.

Given that the Sixth Circuit has held a *prima facie* case of discrimination in the RIF context cannot be established based on the mere fact that all eliminated employees were of a particular

---

[5] The *Li* plaintiff was one of the 96 bargaining unit faculty members included in UA's 2020 RIF.   Dr. Li was a faculty member of the Lebron James Family Foundation School of Education, and she alleged her inclusion in the RIF constituted race (Asian) and national origin (Taiwanese) discrimination.  This Court granted UA's motion for summary judgment and dismissed the case.  The decision is attached hereto as Exhibit A.  (N.D. Ohio Case No. 5:21-cv-2277, ECF #38).

protected class (which is not even the case here as non-Indians/non-Nigerians as well as non-African Americans/non-Asians were included in the nine College RIF selections), any attempt by Plaintiffs to argue that the simple number of Asians vs. non-Asians / African Americans vs. non-African Americans selected for the RIF will not meet the required evidentiary threshold as a matter of law.  *See Slapak v. Tiger Management Group, LLC*, 594 Fed. Appx. 290, 295 (6th Cir. 2014) ("This composition is simply not enough, standing alone, to indicate that it is a result of illegal discrimination.").  Moreover, in a similar case alleging race and age discrimination, a plaintiff attempted to establish her fourth RIF prong by pointing to her department separating three African American employees all over the age of 40; however, the Court quickly discarded this argument. *Heyward v. CDM Smith, Inc.*, 2015 U.S. Dist. LEXIS 103314, *9 (E.D. Tenn. Aug. 5, 2015).  It explained that: "[a]part from the limited value of such a small sample size, narrowly focusing on the procurement department ignores the fact that the RIF was ongoing and company-wide." *Id.* *Slapak* and *Heyward* make it clear that pointing to other impacted employees on a departmental level is insufficient to establish the fourth RIF prong, particularly where the RIF is company-wide, or in this case University-wide.  Plaintiff fails to allege any background circumstances necessary to meet the heightened test for discrimination in the RIF context.

Moreover, this Court has already held in the context of the UA RIF conducted in 2020 that an analysis of the race/national origin of the School of Education's **six** selections was "based on too small a sample" and "too small to provide reliable data."  *Li*, at *25, FN9 citing *Thompson v. Fresh Prods.*, 985 F.3d 509, 522 (6th Cir. 2021); *see also Peeples*, 891 F.3d at 635 (twenty-seven laid off firefighters is a "small number from which to draw such a large inference") and *Simpson v. Midland-Ross,* 823 F.2d 937, 943 (6th Cir. 1987) (sample size of seventeen laid off employees was "suspect").  The Sixth Circuit has previously recognized that "statistical evidence is of much

16

greater value in discrimination cases where large numbers of employees are involved." *Equal Emp't Opportunity Comm'n v. New York Times Broad. Serv., Inc.,* 542 F.2d 356, 360 (6th Cir. 1976).

Similarly, here, any analysis of the **nine** members of the College's RIF selections suffers from the same fatal flaw as held in *Li*: the sample size is too small. But the truly appropriate sample size is even smaller and should be limited to the DOF for the simple reason that Thomson made the initial determinations regarding the positions to be selected for inclusion in the RIF. Those decisions were accepted by the Strategic Initiative Team without any changes. (Thomson Dep. 73). And while it is true that the Team reviewed all faculty members put forth by Departmental Chairs, Thomson cannot substantively analyze the performance of faculty outside his Department.

The non-expert statistical data Plaintiffs may point to is insufficient to demonstrate they were singled out for the RIF due to their race/national origin. Based on its actions, UA demonstrated quite clearly it holds no discriminatory animus based on national origin, race, or any other protected classification.[6]

> ### 2. Plaintiffs Cannot Demonstrate That UA's Legitimate Non-Discriminatory Reasons for Their RIFs are Pretextual

Assuming *arguendo* the Plaintiffs establish a *prima facie* case, the burden shifts to the UA to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action.

---

[6] The only conversation Akhigbe had with anyone in UA's administration regarding the RIF was with Jolene Lane, Vice President of Diversity, Equity and Inclusion, in late June 2020. (Akhigbe Dep. 67; Ex. B). The purpose of this conversation was to ensure diversity issues were taken into consideration in the RIF process. (Akhigbe Dep. 72). And Akhigbe concedes that there were no racial issues at UA as of June 2020. (Akhigbe Dep. 75). Lane informed Akhigbe that she was going to speak with the RIF decision makers and ensure racial issues were considered in RIF process. (Akhigbe Dep. 80-81). He believed Lane sufficiently addressed his concerns. (Akhigbe Dep. 85). Similarly, Balasubramnian concedes that no one in UA administration made any racially offensive comments to her during her employment. (Balasubramnian Dep. 75-76).

*Burdine*, 450 U.S. at 254-56.  If UA satisfies its burden, each Plaintiff must then show not only that UA's articulated reason was a pretext, but that the real reason was unlawful discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).  The ultimate burden of persuasion remains throughout this analysis on Plaintiffs. *Burdine*, 450 U.S. at 253.

UA clearly had legitimate non-discriminatory reasons for its decisions.  Plaintiffs presumably are not questioning the foundation for UA's invocation of Collective Bargaining Agreement Article 15 Section 12 RIF and consequential elimination of 96 faculty positions due to the financially catastrophic circumstances occasioned by COVID-19.  Given Plaintiffs are bargaining unit members bound by Arbitrator Buettner's decision that the RIF action complied with the Agreement's *force majeure* provision in Article 15, Section 12 (i.e., that catastrophic financial circumstances existed that warranted the RIF) (Ex. X), UA has more-than met its burden on this point. *See Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999) (finding that the employer had a legitimate, non-discriminatory reason for the termination as part of a RIF when the plaintiff presented no evidence that the RIF was not *bona fide*).

"If the employer meets its burden, the burden shifts back to the plaintiff to establish that the proffered reason was merely pretext for unlawful discrimination." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 522 (6th Cir. 2021).  At this stage, it is not enough for the plaintiffs to merely question the reasons given by UA.  Rather, they must affirmatively prove that the reasons are "*in fact a coverup for a racially [or ethnic-based] discriminatory decision*." *Hicks*, 509 U.S. at 517 ("It is not enough, in other words, to *dis* believe [sic] the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (emphasis in original) (citation omitted)).  Plaintiffs must come forward with facts that, if believed, would support a finding that the proffered reason was merely a pretext for unlawful discrimination.

To establish pretext, Plaintiffs must show that UA's proffered reason "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Thompson*, 985 F.3d 522 (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 274 (6th Cir. 2003)).  It is unclear how Plaintiffs might attempt to show pretext.  They cannot simply rely on their own opinion or on their national origin/race alone to meet the pretext burden.  *See, e.g., Harper v. City of Cleveland*, N.D. Ohio Case No. 1:16-cv-2972, 2018 U.S. Dist. LEXIS 76749, at *19, FN20 (N.D. Ohio May 7, 2018) ("The fact that allegedly 'bad' things happen to a person who is African-American (or a woman, or disabled, or older, etc.) does not *prove* discrimination on the basis of that protected characteristic.") (citing *EEOC v. Lucent Technologies, Inc.*, 226 Fed. Appx. 587, 591 (6th Cir. 2007) ("The mere fact that [plaintiff] was African-American is not enough to establish that he was someone targeted for termination… [the plaintiff] certainly cannot be arguing that [his] race alone somehow permanently insulated him from ever being terminated…").

Plaintiffs may point to the "new" criteria used to calculate the Total Impact Scores and the purported "subjective way" in which the scores were assigned.  (Akhigbe Dep. 211).  As an initial matter, the purpose of the annual merit scores is far different than the purpose of the RIF. (Thomson Dep. 23-24).  The faculty member's annual merit review process is "formulaic" and "driven by the collective bargaining agreement."  (Thomson Dep. 26-27).  Two faculty members could receive a similar score in one of the three measured areas of teaching, research or service, but could provide UA with very different levels of contribution.  (Thomson Dep. 27).

Moreover, employers are free to use whatever criteria they deem appropriate, irrespective of how subjective the employees deem the criteria.  The "use of subjective criteria does not by itself show discrimination, **particularly in a reduction in force case**."  *Beck v. Buckeye Pipeline*

*Servs.*, 501 Fed. Appx. 447, 451 (6th Cir. 2012); *see also Tillotson v. Manitowoc Co.*, 727 Fed. Appx. 164, 169 (6th Cir. 2018) (stating that a plaintiff cannot prove discrimination merely because the employer relied upon highly subjective qualities in making an employment decision) (internal citation omitted).  And Thomson was able to cite to specific objective examples to support the alleged "subjective" Total Impact scores assigned to Plaintiffs.  *See Idemudia v. Chase*, 434 Fed. Appx. 495, 505 (6th Cir. 2011) (citing specific examples to support employer's subjective evaluation).

Akhigbe will presumably point to a change in his assigned courses to be taught in 2020-21.  (Akhigbe Dep. 94).  Specifically, in March 2020, Thomson assigned Akhigbe to teach MBA Weekend course 602 (Managerial Finance).   Then in May 2020, Thomson switched this assignment to John Goodell (Caucasian).  *Id.*  Akhigbe's testimony about the switch is difficult to parse; essentially, he contends Thomson made this switch in order to contend that Akhigbe did not teach any core classes at the time of the RIF.  (Akhigbe Dep. 94-95). But the record belies Akhigbe's conjecture. The DOF faculty (not Thomson) had voted to change the Weekend MBA curriculum in Fall 2019 -- nearly a full *year* prior to the RIF.  The faculty vote resulted in the elimination of one of two finance classes in the Weekend MBA; specifically, course 674, which Akhigbe had taught since 2012. (Thomson Dep. 103-104; Akhigbe Dep. 37).  Neither COVID-19 nor a University-wide RIF were on the DOF's radar at that time. Thomson initially reassigned the remaining Weekend MBA finance class (course 602) to Akhigbe, but Thomson had to "reshuffle" the teaching schedules after the University directed him in Spring 2020 not to renew any visiting faculty. This resulted in Goodell being tapped to teach course 602 instead.  (Thomson Dep. 122).

Akhigbe's argument about course 602 ultimately fails for a simple reason:  Goodell was not assigned a point for "critical adjustment" in the RIF analysis.  (Thomson Dep. 122-23; Ex. U).

Even if Akhigbe had taught the course in question, it would have not impacted his critical adjustment score, and his Total Impact score would not have increased.  (Thomson Dep. 122-23).

With respect to Balasubramnian's anticipated pretext arguments, they have already been addressed and discarded **by her own union**.  The AAUP denied Balasubramnian's request to take her case to arbitration because it **specifically concluded that there was no discrimination or retaliation as it related to her inclusion in the RIF.**  (Balasubramnian Dep. 174-75, 185-86; Ex. BBB).  The AAUP determined: "[t]he claim that your layoff was due to your national origin or race is not supported by sufficient evidence to pursue the claim to arbitration.  The claim that your layoff was due to retaliation for your complaint to the University's EEO office is also not supported by the evidence." (Ex. BBB).  The AAUP then analyzed five separate **pretext** arguments advanced by Balasubramnian (some of which she will presumably raise in her Memo Contra), and disputed each one.  (Ex. BBB).  Those included:

1. Prior negative merit evaluations (the AAUP responded by stating that merit scores were determined by non-administration faculty and were not appealed at that time)

2. Unfavorable class schedules (no connection to race or national origin and she was given better schedules after she raised the issue with Thomson)

3. Non-payment for online course development (it is not clear that stipends paid to others were paid under the same circumstances as Balasubramnian, and stipends were offered by UA only when it wants a particular course developed and needs to incentivize its development and/or if UA wants to co-own the materials developed; and there is no race or national origin correlation with respect to the faculty who were paid stipends)

4. Application for professional development leave was denied for two years (there is no connection because the leave decision maker (Ramsier) was not involved in the RIF decision, and there is insufficient evidence that her applications were denied for discriminatory/retaliatory reasons)

5. Denied summer teaching courses until 2020 (same analysis as unfavorable class schedules: no connection to impermissible discrimination or retaliation, and tenured faculty may be less likely to receive summer teaching assignments because of how summer budgets have been allocated and the higher rate paid to tenured

faculty versus non-tenure track faculty)

The AAUP also specifically found that the four-year gap between her pay increase request and the RIF "is not so close in time that it raises an inference of retaliation.  There is insufficient evidence otherwise that you were selected for layoff in retaliation for this complaint."  (Ex. BBB)

 Moreover, when Balasubramnian was asked about why she believed she had been discriminated against at a Step 1 union grievance hearing (where UA and AAUP administrators were present) (Balasubramnian Dep. 206), Balasubramnian admittedly responded by stating she "did not know." (*Id.* at 217).

Plaintiffs simply cannot demonstrate that the reasons offered by UA were false or pretextual:

- Akhigbe had a significantly higher salary than any other faculty member in the Department or College;

- Akhigbe had a reduced teaching load due to his research focus (which was of minimal value when the College was attempting to survive);

- Akhigbe had the lowest teaching score in the DOF;

- Balasubramnian had one of the lowest teaching scores in the DOF;

- Balasubramnian was tied for the lowest service score in the DOF;

- Plaintiffs did not teach in critical areas – their separations did not jeopardize any courses or programs; and,

- Plaintiffs did not teach in high-growth areas in the DOF, as identified in the Department's strategic plan, which had input from all faculty members and was developed years before the RIF.

### B.        Plaintiffs' Retaliation Claims Fail

This is not a direct evidence case.   (Akhigbe Dep. 91; Balasubramnian Dep. 76-77).

Accordingly, Title VII retaliation claims utilize the familiar burden-shifting framework set forth

in *McDonnell Douglas*).  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).  Plaintiffs

must first establish the elements of a *prima facie* case. They must show:

> "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected
> activity was known by the defendant; (3) thereafter, the defendant took an action
> that was materially adverse to the plaintiff; and (4) a causal connection existed
> between the protected activity and the materially adverse action."

*Id.* "Title VII retaliation claims 'must be proved according to traditional principles of but-

for causation,' which 'requires proof that the unlawful retaliation would not have occurred in the

absence      of      the      alleged      wrongful      action      or      actions      of      the      employer.'"

*Id.* at 731 (quoting *Univ. of Texas S.W. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

If Plaintiffs can make out a *prima facie* case, UA then must articulate a legitimate, non-

retaliatory reason for the termination.  *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 613

(6th Cir. 2019) (citing *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017)).

Plaintiffs then must show that the reason is actually pretext for retaliation.  *Redlin,* 921 F.3d at 614

(citing *Mansfield*, 706 F. App'x at 236).

Balasubramnian cannot establish the fourth prong of her *prima facie* case.  As for Akhigbe,

while he expressed pay discrimination concerns to his union in 2016, he concedes that he did not

share his concerns with anyone else, including RIF decision makers.  Accordingly, he cannot

establish the second or fourth prongs of his *prima facie* case.

By way of background, Balasubramnian requested a pay increase in May 2016 to then-

College Dean Krovi.  (Balasubramnian Dep. 20-21).  Dean Krovi directed Balasubramnian to

contact her Departmental AAUP liaison, Akhigbe.  (Balasubramnian Dep. 22).  Her concern was

the pay disparity between her and other tenure-track faculty as well as a newly-recruited non-tenure track faculty.  (Balasubramnian Dep. 24).  She claims that at that time, she indicated to Dean Krovi, Thomson and two union officials that she felt discriminated against on the basis of her gender, race, color, national origin, and religion.  (Balasubramnian Dep. 25).  Another member of the DOF made a similar request for increased compensation at that time, Suzanne Gradisher.  (Balasubramnian Dep. 28).  Balasubramnian submitted her request for increased compensation on May 9, 2016.  (Ex. J).  On June 3, 2016, Akhigbe submitted a letter in support of both Balasubramnian and Gradisher.  (Ex. I).  Neither letter made mention of discrimination concerns.

In response to Balasubramnian's concern, UA provided her with a pay increase of $15,555.  (Balasubramnian Dep. 19; Ex. L, p. 3).  Despite this, Balasubramnian was not pleased with the outcome of her salary increase appeal.  (Balasubramnian Dep. 37).  She felt she should have been compensated not only a go-forward basis, but she also should have received backpay for the time period of 2012 (when she was hired) until 2016 (when the raise was effective).[7]  (Balasubramnian Dep. 41-42; Ex. LL, pp. 1-2).  Balasubramnian appealed the denial of backpay.  On March 19, 2018, then-Provost Rex Ramsier denied her request and told Balasubramnian  "I would very much appreciate it if you would use your skills and energies to focus on teaching our students and performing your research, vs. continuing along this line of requests to be paid more.  In doing so, you are consuming your valuable time, and the time of many others on campus."  (Ex. LL, p. 4).  Balasubramnian considered the language used by Ramsier to be "extremely disrespectful."  (Balasubramnian Dep. 52).  But she did not have any conversations with College leadership regarding Ramsier's denial letter.  *Id.*  And, as discussed below, Ramsier had zero involvement in Balasubramnian's inclusion in the RIF.

---

[7] Gradisher received a pay increase, but did not pursue backpay.  (Akhigbe Dep. 146-47).

On July 11, 2018, Balasubramnian filed an internal complaint of discrimination regarding her pay increase with UA's Equal Employment Opportunity Office.[8]  (Balasubramnian Dep. 54; Ex. MM).  In October 2018, the EEO Office issued its determination, finding no discrimination. (Balasubramnian Dep. 58; Ex. NN).  Balasubramnian had a conversation with Thomson regarding the denial letter, and informed him that she was not going to pursue the matter any further. (Balasubramnian Dep. 59-60).  Balasubramnian did not express any further discrimination concerns during the remainder of her employment.  (Balasubramnian Dep. 60).

Akhigbe concedes he only complained of gender discrimination associated with Balasubramnian and Gradisher's salaries to one union executive.  (Akhigbe Dep. 138-40). Akhigbe admittedly does not know if the union executive shared his concerns with anyone in UA's administration.  (Akhigbe Dep. 140).  Akhigbe sent a letter to the then-Dean expressing support for the wage increases on June 3, 2016, but he does not make any reference to discrimination whatsoever. (Ex. I).  "[T]o establish actionable retaliation, the relevant decision maker, not merely some agent of the defendant, must possess knowledge of the plaintiff's protected activity." *Escher v. BWXT Y-12, LLC*, 627 F.3d 1020, 1026 (6th Cir. 2010).  Here, Akhigbe cannot make a showing that any RIF decisionmaker had knowledge of his gender discrimination concerns as expressed in 2016.  Accordingly, his retaliation claim fails at the second prong.

UA concedes that Balasubramnian engaged in protected activity – the final instance occurring on July 11, 2018 when she filed her EEO complaint.  (Ex. MM).  UA also concedes Thomson was aware of her complaint (according to Balasubramnian's testimony, which must be accepted as true at this stage), and she was subjected to an adverse action in the form of her

---

[8] This is the only internal discrimination complaint filed by Balasubramnian.  (Balasubramnian Dep. 54, 57).  Akhigbe never filed such a complaint during his employment.  (Akhigbe Dep. 151).

separation.  However, she (and Akhigbe, if, assuming *arguendo*, that the RIF decisionmakers were aware of his sharing discrimination concerns on behalf of Balasubramnian in 2016) cannot establish the fourth element as there is no causal connection between her EEO complaint in July 2018 and her notice of separation in July 2020 – a span of two years.

"To prove a causal connection, a plaintiff must produce sufficient evidence from which an inference can be drawn that the defendant took the adverse employment action because the plaintiff engaged in protected activity." *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 588 (6th Cir. 2022) (cleaned up).  "A plaintiff who shows that the adverse action occurred immediately after the protected activity may be able to rely on temporal proximity alone to overcome a motion for summary judgment." *Id.*  But if "some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  While mere temporal proximity between the employer's knowledge of the protected activity and the adverse employment action can act as sufficient evidence of causality to establish a *prima facie* case, the temporal proximity must be so close as to be unusually suggestive.  *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001); *Mickey*, 516 F.3d at 525.

Approximately two years passed between Balasubramnian's complaint and her RIF.  This passage of time is insufficient to establish a causal connection.  *See, e.g., Henning v. City of Jackson*, 2023 U.S. App. LEXIS 14813, *9 (6th Cir. June 14, 2023) ("Nearly three years elapsed between Henning's 2017 EEOC charge and [her RIF].  Given the absence of other evidence of retaliatory conduct, Henning failed to establish a prima facie case of retaliation.")

It is not clear what "other evidence of alleged retaliatory conduct" Balasubramnian may

present as she concedes that Thomson never expressed disagreement or frustration with her request for increased compensation. (Balasubramnian Dep. 73). To the contrary, Thomson supported her request (as well as Gradisher's). (Thomson Ex. 12, ¶19). But what is clear is that she attributes any retaliatory animus arising from her pay increase complaint to Rex Ramsier, whom she believes was involved in the RIF selection process. (Balasubramnian Dep. 220, 246-47). But Balasubramnian concedes that Ramsier was no longer serving in the Provost role at the time of the RIF – he had been replaced by John Wiencek. (Balasubramnian Dep. 246-47). At the time of the RIF, Ramsier served as the Vice Provost and Director of Academic Administrative Services. (Ramsier Dep. 8). He had not been involved in the RIF whatsoever, other than to make recommendations regarding RIF selections for staff he personally oversaw in the Office of Academic Affairs. (Ramsier Dep. 9-10). Plaintiffs cannot connect the dots between complaints of discrimination in 2016 and/or 2018 and their inclusion in the RIF in 2020 because there is no temporal proximity between the events. Nor do the Plaintiffs attempt to explain why Thomson would possess any retaliatory animus towards them – he was not a decision maker with respect to Balasubramnian's request for a pay increase. The focus is on Ramsier, who had nothing to do with Plaintiffs' inclusion in the RIF.

Furthermore, even if Plaintiffs could make a *prima facie* case of retaliation, which they cannot, they cannot demonstrate that UA's termination reasons are pretextual, as discussed above.

## IV.   Conclusion

The University of Akron, on July 15, 2020, eliminated 178 positions campus-wide, including 96 bargaining unit faculty members. The reduction in force was conducted on a massive scale, impacting hundreds of employees. Plaintiffs were <u>not</u> singled out based on their race and/or national origin, or in retaliation for years-old protected activity.

The College of Business Administration required two things to stay afloat:  students and money.  The RIF factors attempted to capture these efforts while not crippling the delivery of certain programs and courses.  Unfortunately for Plaintiffs, they did not bring in either.  Further, their teaching and service were ranked low in comparison to their colleagues.  When a College and Department are attempting to survive, research is not particularly important.  Further, Akhigbe was the highest paid faculty member in the entire University with minimal teaching expectations.  UA clearly had legitimate non-discriminatory/non-retaliatory reasons for the RIF as a whole and to RIF the positions held by Plaintiffs.  Plaintiffs cannot produce any evidence to establish their *prima facie* cases of discrimination or retaliation, or to otherwise mount an attack on UA's legitimate business reasons.

For the foregoing reasons, no dispute of material fact exists and grant of Defendant's summary judgment motion is fully supported as a matter of law on Plaintiffs' Title VII claims of race/national origin discrimination and retaliation.  Accordingly, Defendant requests that the Court grant summary judgment in its favor.

Respectfully submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)
ZASHIN & RICH CO., L.P.A.
17 South High Street, Suite 900
Columbus, OH 43215
Telephone: (614) 224-4411
Facsimile: (614) 224-4433
dcp@zrlaw.com

Sarah J. Moore (0065381)
ZASHIN & RICH CO., L.P.A.
950 Main Avenue, 4th Floor
Cleveland, OH 44113

28

Telephone: (216) 696-4441
Facsimile: (216) 696-1618
*sjm@zrlaw.com*

*Attorneys for Defendant University of Akron*

## CERTIFICATIONS OF COMPLIANCE WITH ¶ 15 OF
## CASE MANAGEMENT CONFERENCE ORDER AND LOCAL RULE 7.1(f)

Pursuant to ¶ 15 of the Case Management Conference Order (Doc. 9, p. 4, PAGEID #100), Drew C. Piersall, as counsel for Defendant in this case, hereby certifies that he sent Plaintiff's counsel a written request to dismiss this action in its entirety prior to the filing of this Motion. Plaintiff's counsel responded on September 27, 2023, and declined to do so.  The undersigned further certifies in compliance with Loc. R. 7.1(f) that this Court extended the page limitation (see Non-Document Order issued on October 20, 2023), and that the preceding memorandum is not in excess of 30 pages in length.

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)

## CERTIFICATE OF SERVICE

This will certify that the foregoing was filed electronically on October 20, 2023.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)