**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

AIGBE AKHIGBE, Ph.D., et al.,  )  CASE NO. 5:22-CV-01990-BYP
                                               )
           Plaintiffs,  )
                                                 )
          v.  )  JUDGE PEARSON
                                               )  MAG. JUDGE HENDERSON
THE UNIVERSITY OF AKRON,  )
                                               )
           Defendant.  )

**PLAINTIFFS' BRIEF IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Ellen M. Kramer (#0055552)
*emk@crklaw.com*
Joshua R. Cohen (#0032368)
*jcohen@crklaw.com*
COHEN ROSENTHAL & KRAMER LLP
3208 Clinton Avenue
One Clinton Place
Cleveland, Ohio 44113
Tel.: (216) 815-9500
Fax: (216) 781-8061

*Counsel for Plaintiffs Aigbe Akhigbe, Ph.D.*
*and Bhanu Balasubramnian, Ph.D.*

## TABLE OF CONTENTS

I. PRELIMINARY STATEMENT ........................................................................................ 1

II. FACTUAL BACKGROUND ........................................................................................... 2

   A. Aigbe Akhigbe, Ph.D. was a major contributor to the College of Bus. Admin. ........................ 2

   B. Bhanu Balasubramnian, Ph.D. was a very involved member of the College of Bus. Admin. .. 4

   C. Statistical evidence shows a statistically significant impact on the College of Bus. Admin.'s selection of African Americans for the RIF. ......................................................................................... 5

   D. Statistical evidence shows a statistically significant impact on the University's selection of Asians for the RIF. .................................................................................................................................. 6

   E. The Defendant's administration does not notify the College of Bus. Admin. or the Defendant's own union negotiating team of the findings of disparate impact. ................................... 7

   F. Thomson ignores the College of Bus. Admin.'s RIF guidelines in order to protect a white Finance Department faculty member. ..................................................................................................... 8

   G. Thomson reassigns classes right before the RIF to discount the University's need for Akhigbe. ................................................................................................................................................... 9

   H. The Total Impact Scores were subjective and full of errors. ................................................. 9

      1. Service Adjustment scores ................................................................................................. 11

      2. Critical Adjustment scores ................................................................................................ 13

      3. Non-tuition Revenue Generation Potential ...................................................................... 14

      4. Teaching in a High Growth Program ............................................................................... 16

   I. The Defendant did not follow the RIF guidelines from its own HR Department. ................. 16

   J. Statistical evidence shows that faculty who had pursued grievances against the Defendant were ten times more likely to be selected for the RIF. ....................................................................... 18

   K. Dr. Balasubramnian engaged in recent protected activity. .................................................... 19

   L. A few weeks before the RIF some Department Chairs indicated a preference for terminating AAUP faculty members. ....................................................................................................................... 19

   M. Dr. Akhigbe was not the highest paid faculty member in the College of Bus. Admin. or the University. ............................................................................................................................................. 19

   N. Defendant's Memo includes several notable misstatements. ................................................ 20

III. LEGAL ARGUMENT .................................................................................................. 21

   A. The Defendant cannot meet the standard required for summary judgment in its favor. ....... 21

   B. Plaintiffs have established a prima facie case of discrimination based on race. ................... 21

      1. Statistical evidence supports a conclusion that the Defendant engaged in unlawful discrimination in selecting Plaintiffs for the RIF. ......................................................................... 23

      2. The Defendant's reliance on subjective criteria for the College of Bus. Admin. RIF selections support a finding of unlawful discrimination. ............................................................... 24

i

**C.   Balasubramnian has established a prima facie case that she was selected for the RIF in retaliation for engaging in protected conduct.** ................................................................26

**1.   Temporal proximity and other circumstantial evidence further support Balasubramnian's claim of retaliation.** ................................................................................27

**D.   The Defendant's purported legitimate business reason is pretextual.** .....................27

**IV.   CONCLUSION** ................................................................................29

**CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(f)** ...............................30

**CERTIFICATE OF SERVICE** ................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Cases**

Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .................. 21

Apsley v. Boeing Co., 691 F.3d 1184 (10th Cir. 2012) ..................................................... 6

Beck v. Buckeye Pipeline Services Co., 501 Fed. Appx. 447 (6th Cir. 2012) ........................... 24

Blair v. Henry Filters, Inc., 505 F.3d 517 (6th Cir. 2007) ..................................... 23, 28

Briggs v. Univ. of Cincinnati, 11 F.th 498 (6th Cir. 2021) ............................................. 28

Browning v. Dep't of the Army, 436 F.3d 692 (6th Cir. 2006) ........................................... 27

Ceglia v. Youngstown State Univ., Case No. 14AP-864, 2015-Ohio-2125, 38 N.E.3d 1222 (10th Dist.) ............................................................................................... 25

Chen v. Dow Chemical Co., 580 F.3d 394 (6th Cir.2009) ........................................... 27

Davis v. District of Columbia, 925 F.3d 1240 (D.C. Cir. 2019) ........................................ 24

Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344 (6th Cir. 1998) .............................. 22

Faure v. Ohio State Univ., Case No. 2:19-cv-1949, 2021 WL 5918914 (S.D. Ohio Dec. 14, 2021) ............................................................................................... 26

Frappied v. Affinity Gaming Black Hawk, LLC, 966 F.3d 1038 (10th Cir. 2020) ................. 6, 23

George v. Youngstown State Univ., 966 F.3d 446 (6th Cir. 2020) .............................. 25, 26

Harris v. City of Akron, Ohio, 836 Fed. Appx. 415 (6th Cir. 2020) ............................... 24

Jones v. City of Boston, 752 F.3d 38 (1st Cir. 2014) ................................................. 23

Joyce v. Cleveland Clinic Found., No. 1:13CV01224, 2014 WL 4852265 (N.D. Ohio Sept. 29, 2014) ........................................................................... 21, 22, 26, 27

Kimble v. Wisconsin Dept. of Workforce Dev., 690 F.Supp.2d 765 (E.D.Wis. 2010) ............... 22

Laster v. City of Kalamazoo, 746 F.3d 714 (6th Cir. 2014) ......................................... 25

Lyons v. Tecumseh Local School District, Case No. 3:23-cv-74, 2023 WL 6442825 (S.D. Ohio Oct. 3, 2023) ......................................................................................... 26

Mickey v. Zeidler Tool & Die Co., 516 F.3d 516 (6th Cir. 2008) .................................. 26

Mitchell v. Toledo Hosp., 964 F.2d 577 (6th Cir. 1992) ............................................. 22

Nguyen v. City of Cleveland, 229 F.3d 559 (6th Cir. 2000) ......................................... 26

Peeples v. City of Detroit, 891 F.3d 622 (6th Cir. 2018) ...................................... 22, 23

Raytheon Co. v. Hernandez, 540 U.S. 44, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) ................... 21

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000) .................................... 28

Reminder v. Roadway Express, Inc., Case No. 5:04-CV-02581, 2005 WL 2860983 (N.D. Ohio Nov. 1, 2005) ................................................................................... 6, 7

Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc., 690 F.2d 88 (6th Cir. 1982) ......... 24

Scott v. Eastman Chemical Co., 275 Fed.Appx. 466 (6th Cir. 2008) ................................ 25

Scott v. Goodyear Tire & Rubber Co., 160 F.3d 1121 (6th Cir. 1998) ............................... 7

Shah v. NXP Semiconductors USA, Inc., 2011 WL 9517443 (E.D. Mich. March 16, 2011) ....... 22

Sharp v. Aker Plant Servs. Grp., Inc., 600 F.App'x 337 (6th Cir. 2015) ......................... 26

Skalka v. Fernald Envtl. Restoration Mgmt. Corp., 178 F.3d 414 (6th Cir. 1999) ............... 22

Stone v. Autoliv ASP, Inc., 210 F.3d 1132 (10th Cir. 2000) ........................................ 23

Sutherland v. Michigan Dep't of Treasury, 344 F.3d 603 (6th Cir. 2003) .......................... 28

Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) 23

Thomas v. Eastman Kodak, 183 F.3d 38 (1st Cir. 1999)................................................................ 25
Thompson v. Fresh Products, LLC, 985 F.3d 509 (6th Cir. 2021).................................... 22, 23, 27
Thurman v. Yellow Freight Sys., 90 F.3d 1160 (6th Cir. 1996)................................................... 25
Tolton v. Day, Case No. 19-945, 2020 WL 2542129 (D.D.C. May 19, 2020)............................ 24
Wexler v. White's Fine Furniture, 317 F.3d 564 (6th Cir. 2003).................................................. 22

**Statutes**

29 C.F.R. § 1607.4(d) ................................................................................................................... 5
Civil Rights Act of 1964 § 7, 42 U.S.C. § 2000e et. seq. (1964)................................. 1, 21, 22, 25

**Other Authorities**

John Goodell, Ph.D., The University of Akron, Ohio, accessed November 20, 2023,
   https://www.uakron.edu/cba/about-us/directory/profile-detail-dm.dot?u=johngoo ................ 12
U.S. Department of Labor, Validation of Employee Selection Procedures, Office of Federal
   Contractor Compliance Programs, https://www.dol.gov/agencies/ofccp/faqs/employee-
   selection-procedures (accessed November 20, 2023) ................................................................ 6

## I.    <u>PRELIMINARY STATEMENT</u>

The Plaintiffs, long-time, dedicated faculty members of the Defendant University of Akron's College of Business Administration ("College of Bus. Admin.") Department of Finance ("Finance Dept."), were selected for a large reduction in force ("RIF") conducted by the Defendant in the summer of 2020.   Plaintiff Akhigbe is black and was born in Nigeria.   Plaintiff Balasubramnian is Asian and was born in India.   None of the white, American-born faculty in the Finance Dept. were selected for the RIF, and very few white, American born faculty in the College of Bus. Admin. and the University as a whole were selected.

Title VII, 42 U.S.C. § 2000e-2 prohibits discrimination with respect to employment because of an individual's race or national origin.   Title VII also prohibits employment discrimination in retaliation for an employee's engagement in protected conduct.   The Plaintiffs are pursuing claims for race, national origin and retaliation discrimination.

A prima facie case of race and national origin discrimination where direct evidence is lacking consists of the following elements:  1) membership in a protected class; 2) suffering of an adverse employment action; 3) qualified for the position; and 4) replaced by someone outside of the protected class or treated differently than similarly-situated, non-protected employees.   The elements required for a prima facie case of retaliation are:  1) engaged in activity protected by Title VII; 2) the exercise of the protected activity was known by the employer; 3) thereafter, the employer took action materially adverse to the plaintiff; and 4) there is a causal connection between the protected activity and materially adverse action.   In the context of a RIF, these elements are modified so that a plaintiff must show additional circumstantial or statistical evidence tending to indicate that the plaintiff was singled out for discharge for impermissible reasons.

There are two primary reasons the Defendant contends that summary judgment in its favor is appropriate.  First, the Defendant argues that the Plaintiffs cannot satisfy the heightened standard

required in the context of a RIF to prove prima facie cases. Second, even if the Plaintiffs can establish prima facie cases, the Defendant has demonstrated legitimate, non-discriminatory reasons to RIF the Plaintiffs, and the Plaintiffs cannot show pretext to rebut the Defendant's legitimate reasons.

The Plaintiffs, however, have additional circumstantial and statistical evidence tending to indicate they were singled out for the RIF for impermissible reasons. Disparate impact analyses prepared by the Defendant show that the RIF had a statistically significant adverse impact on African Americans and Asians. Further, the Defendant's failure to follow its own RIF guidelines and its use of subjective criteria to select the Plaintiffs for the RIF lend themselves to close scrutiny, especially as the decision-makers in this case were not members of the protected classes. The Plaintiffs have plenty of evidence of pretext, as much of the "data" purportedly relied on by the Defendant was false.

Summary judgment should not be entered in favor of the Defendant. Rather, the Plaintiffs should be permitted to take their claims to trial.

## II. FACTUAL BACKGROUND

### A. Aigbe Akhigbe, Ph.D. was a major contributor to the College of Bus. Admin.

Dr. Akhigbe was hired by the Defendant in 2000 as the Frederick W. Moyer Endowed Chair in Finance. ECF#25, PageID#: 1662. Endowed Chair positions are bestowed on outstanding faculty. ECF#30-1, PageID#: 2011. At the time of this RIF there were a total of five Endowed Chairs with the Defendant. *Id*.

Due to his stature as an Endowed Chair, Dr. Akhigbe's workload differed from those of other College of Bus. Admin. faculty and focused more heavily on research. *Id.* at 2011-12. From 2002 through 2020, Dr. Akhigbe was required to teach 9 credit hours and devote 15 credit hours to research each academic year. *Id.* This translated to teaching 3 courses per year and

2

significantly higher publication requirements than other College of Bus. Admin. faculty.  *Id.*
Regular tenure track faculty in the College of Bus. Admin. were required to teach 18 credit hours
and research 6 credit hours, which translated to teaching 3 courses per semester, with lighter
publication obligations.  *Id*. at 2012.

Dr. Akhigbe is African and immigrated to the U.S. from Nigeria.  ECF#25, PageID#:
1662.  Akhigbe has been a U.S. citizen since 1995.  ECF#30-1, PageID#: 2011.  He was the only
African American faculty member in the Finance Dept. at the time of the RIF.  ECF#25, PageID#:
1662-63.  Akhigbe had taught in the College of Bus. Admin.'s weekend MBA program since the
inception of that program in 2013.  ECF#20-1, PageID#: 383-84.

Akhigbe was a member of the Defendant's Faculty Senate in 2020, holding that role
since 2019, when he was elected by faculty in the College of Bus. Admin.  ECF#20-1, PageID#:
288-89.  From 2019 to 2020 Akhigbe served as chair of the Full-Professor Promotion Committee
for the Finance Dept. and Dean's Excellence Research Award Committee.  *Id.* at 415-16; ECF#30-
1, PageID#: 2012.  In that same time frame he also was a member of the Chair Review Committee
for the Finance Dept., the College of Bus. Admin.'s Graduate Leadership Development Committee
and the Defendant's Nominating Committee.  ECF#20-1, PageID#: 415; ECF#30-1, PageID#:
2012.

Akhigbe was the Finance Dept. liaison to the Defendant's faculty union, Akron-AAUP,
from 2014 until the RIF in 2020.  ECF#30-1, PageID#: 2012.  Akhigbe served as Associate Editor
of the business journals International Review of Economics and Finance from 2019 to 2020 and
Journal of Financial Research from 2010 to 2018.  *Id.*  Leading up to the RIF Akhigbe also served
on the Editorial Board of the following business journals:  Journal of African Business (2016-

3

2020), International Review of Accounting, Banking and Finance (2009-2020), and European Research Studies Journal (2008-2020).  *Id.* at 2012-13.

**B. Bhanu Balasubramnian, Ph.D. was a very involved member of the College of Bus. Admin.**

Dr. Balasubramnian was hired by the Defendant in 2011 as a tenure-track Assistant Professor in the Finance Dept.  ECF#25, PageID#: 1663.  Dr. Balasubramnian's race is Asian, and her national origin is Indian.  *Id.*  At the time of the RIF, Dr. Balasubramnian was not an American citizen.[1]  ECF#30-2, PageID#: 2015.

Dr. Balasubramnian was faculty advisor for several teams of business students which participated in numerous regional and national business competitions in 2017, 2018 and 2019.  *Id.* Between 2017 and 2019, Balasubramnian's teams garnered $6,250 in award money for the University through these competitions.  *Id.*

Balasubramnian was the Associate Editor of American Journal of Business from August 2016 through July 2020, and served on the following committees in the years leading up to the RIF:

- Finance Dept. Research Committee 2014-17
- Finance Dept. Administrative Asst. Committee 2015, 2018, 2019
- Graduate Admissions Committee 2018-2020
- Undergraduate Curriculum Committee 2015-2020
- Master's in Finance Exploratory Committee 2015-2020
- Association to Advance Collegiate Schools of Business ("AACSB") Assurance of Learning Committee for Analytical Reasoning 2014-2020

*Id.* at 2015-16.

---

[1] Dr. Balasubramnian became a U.S. citizen after the RIF.  ECF#30-2, PageID#: 2015.

**C. Statistical evidence shows a statistically significant impact on the College of Bus. Admin.'s selection of African Americans for the RIF.**

The Equal Employment Opportunity Commission has adopted a rule of thumb which provides that it will generally consider a selection rate for any protected class which is less than four-fifths (80%) of the selection rate for the group with the highest selection rate as evidence of adverse impact.  29 C.F.R. § 1607.4(d).  This rule is referred to as the four-fifths or 80% rule.  *Id*. The four-fifths or 80% rule "establishes a numerical basis for drawing an initial inference and for requiring additional information."  *Id*.

Tami Hannon was employed by the University as the Director of Equal Employment Opportunity and Affirmative Action in June and July of 2020.  ECF#17, PageID#: 187.  In her position as Director, Hannon prepared several disparate impact analyses in June and July of 2020 relating to the RIF.  *Id*.  According to the Disparate Impact Analysis Hannon prepared for the College of Bus. Admin., there was a statistically significant impact on the College of Bus. Admin.'s selection of African Americans for the RIF.  *Id*. at PageID#: 189.

In addition to Akhigbe and Balasubramnian, the College of Bus. Admin. selected nine (9) other faculty for the RIF, ultimately terminating eleven (11) faculty.  ECF#22-1, PageID#: 1271.  Prior to the RIF, there were five African American employees in the College of Bus. Admin. as a whole.  *Id*.  Three of these five employees were selected to be retained by the University, instead of RIFed, which is a selection rate of 60%.[2]  *Id*.  The selection rate of white employees to be retained was 93% - there were 74 total white employees and 69 were selected for retention.[3]

---

[2] Hannon's analysis actually refers to the selection rate for the RIF, which was 40% in the case of African Americans. Extrapolating, that means 60% were selected for retention, *i.e.*, the opposite of being RIFed.
[3] Hannon's analysis actually refers to the selection rate for the RIF, which was 7% in the case of White  employees. Extrapolating, that means 93% were selected for retention.

*Id.* A comparison of the African American (60%) to white (93%) selection for retention rate is 64.52%. Since 64.52% is less than 80%, adverse impact is indicated. 29 C.F.R. § 1607.4(d).

A Fisher's Exact Test is often used, including by the U.S. government, to examine statistical significance in small sample sizes. *Frappied v. Affinity Gaming Black Hawk, LLC*, 966 F.3d 1038, 1052 (10th Cir. 2020). *See also* www.dol.gov/agencies/ofccp/faqs/employee-selection-procedures. A Fisher's Exact "calculates the probability that the number of individuals of a particular protected class selected classification would be the same as the number actually selected, if the selection were independent of that classification." *Frappied*, 966 F.3d at 1052. A probability value, also known as a p-value, of less than 0.05 is a statistically significant indication of non-neutrality. *Apsley v. Boeing Co.*, 691 F.3d 1184, 1198 (10th Cir. 2012); *Reminder v. Roadway Express, Inc.*, Case No. 5:04-CV-02581, 2005 WL 2860983 *4n.4 (N.D. Ohio Nov. 1, 2005).

The results of the Fisher's Exact Test analysis prepared by Hannon for the RIF selections in the College of Bus. Admin. was 0.01989275 for African Americans. ECF#17, PageID#: 189. This number is less than 0.025 and means that **there is only a 1.989275% chance that this difference arose because of random chance**. *Id.* Correspondingly, there is a 98.010725% chance that this difference did not arise because of random chance. Restated, if the RIF selections had been made by pulling names out of a hat, there is a 1.98275% chance that the RIF would have ended up the way it did.

**D. Statistical evidence shows a statistically significant impact on the University's selection of Asians for the RIF.**

The Defendant also prepared disparate impact analyses for the University's Main Campus, as well as the University as a whole. For both the Main Campus and the entire University, separate analyses were prepared for Impacted Units Only and for the entire University. ECF#23-1, PageID#: 1378-80. These analyses were of more than 2,000 employees. *Id.*

6

The disparate impact analysis shows a p-value of less than 0.05 with respect to Asian employees.  *Id.*  The Defendant's University wide disparate impact analyses also employed chi-square tests to analyze various protected classes.  ECF#23-1, PageID#:  1378-80.  A chi-square test evaluates the disparity between the expected and observed frequency of a certain outcome.  *Scott v. Goodyear Tire & Rubber Co.*, 160 F.3d 1121, 1125 n.8 (6th Cir. 1998) (quotation omitted).  An example of this would be of individuals terminated as part of a RIF where a greater percentage are within a protected class, such as race.  *Id.*  A chi-square test determines whether chance or other factors influenced the outcome in termination rates.  *Id.*  P-values of 0.05 or lower are generally considered to be statistically significant.  *Reminder*, 2005 WL at *4 n.4.

According to the Defendant's disparate impact analyses, on a University wide basis, looking at both the Main Campus and branch campuses, there is less than a 0.000023726 % chance that the number of Asians selected for the RIF for Impacted Units Only on Main Campus was due to chance.  ECF#23-1, PageID#: 1378.  This means that there is a 0.0023726% probability that the number of Asians selected for the RIF was due to chance.  Correspondingly, there is a 0.0000328368 % chance that the number of Asians selected for the RIF for the entire Main Campus of the University was due to chance.  *Id.*

### E.  The Defendant's administration does not notify the College of Bus. Admin. or the Defendant's own union negotiating team of the findings of disparate impact.

The College of Bus. Admin. Leadership Team was not informed of the statistically significant findings in the disparate impact analyses.  ECF#28, PageID#: 1884.  Nor did the Defendant's administration inform its own team negotiating with the union that the final RIF list showed disparate impact on any protected classes as a result of the RIF.  ECF#23-1, PageID#: 1330, 1340-41.

**F.  Thomson ignores the College of Bus. Admin.'s RIF guidelines in order to protect a white Finance Department faculty member.**

The first criteria used by the College of Bus. Admin. Leadership Team for faculty RIF selections was to determine who was not considered to be a Scholarly Academic ("SA"), but was instead "out of status." ECF#24-1, PageID#: 1443. "Out of status" meant that the professor did not meet the AACSB Scholarship requirements for their position. *Id*. To avoid "O" status, faculty were required to either write three peer-reviewed publications every five years or write two peer-reviewed publications and complete other qualified intellectual contributions which had been established by the College's faculty. ECF#30-2, PageID#: 2016. Three professors in College of Bus. Admin. departments other than the Finance Department were RIFed because they did not have SA status. ECF#24-1, PageID#: 1444.

In June of 2020 Dr. Melinda Newman had written only one publication in the prior five years. Newman had a second article which had been accepted for publication in May of 2020, right before the RIF. [4] ECF#30-2, PageID#: 2016. Newman definitely did not have the three required by the AACSB. *Id.* Despite Newman's failure to meet the requirements to emerge from "O" status, Thomson categorized her as "SA." ECF#24-1, PageID#: 1443-44. This action by Thomson permitted Newman to be assessed with the other Finance Department faculty Total Impact Score analysis when she should have been classified as "Out of Status" and RIFed according to the College of Bus. Admin.'s own guidelines.

---

[4] Since Newman's article was not published until late June of 2020, it should not have even been included in her 2019-20 performance review. ECF#30-2, PageID#: 2016. Rather, it should have been part of her 2020-21 performance review. *Id.*

### G. Thomson reassigns classes right before the RIF to discount the University's need for Akhigbe.

Akhigbe was a long-standing pillar of the Defendant's MBA programs, both the standard and weekend. Akhigbe was an expert at teaching two particular required courses in both MBA programs - Managerial Finance, Course Catalog #602 and Strategic Financial Decision Making, Course Catalog #674.[5] ECF#30-1, PageID#: 2013.

Prior to the Fall of 2020, white, American-born Finance Dept. Professor John Goodell had never taught a graduate level class. *Id.* Instead, Goodell had been teaching the Defendant's International Business Finance and International Banking classes, which had been experiencing a significant decline in students prior to the RIF. *Id.*

On March 2, 2020, Thomson assigned the standard MBA class Managerial Finance 602 to Akhigbe. *Id.* The plan at that time was for a visiting faculty to teach the Defendant's other Managerial Finance section. *Id.* Eight weeks later, on May 7, 2020, Thomson offered Goodell both of these sections of Managerial Finance and Strategic Decision Making, Course No. 674. *Id.*; ECF#24-1, PageID#: 1649. On the same day, Thomson informed Akhigbe that Akhigbe would no longer be teaching Managerial Finance 602, and instead informed Akhigbe that Akhigbe would be teaching an elective – Capital Budgeting, Course No. 678. ECF#30-1, PageID#: 2013.

### H. The Total Impact Scores were subjective and full of errors.

In 2020, Susan Hanlon and James Thomson, both Caucasian and American, were the Interim Dean and Associate Dean of the College of Bus. Admin., respectively. ECF#25, PageID#: 1665. Thomson also was Chair of the Finance Dept. ECF#24-1, PageID#: 1639. Hanlon and Thomson, along with Drs. Steven Ash, Deborah Owens, Sucharita Ghosh and Li Wang, made up

---

[5] In 2019, the Defendant had switched Strategic Financial Decision Making 674 from a required to an elective course in the MBA programs. ECF#30-1, PageID#: 2013-14. However, that change did not take effect immediately, and Strategic Financial Decision Making 674 was still required for MBA students in the program in Fall of 2020. *Id.*

the College of Bus. Admin.'s Strategic Initiative Team ("Leadership Team"). *Id*. at 1665. The Leadership Team – Hanlon, Thomson, Ash, Owens, Ghosh and Wang - determined what criteria would be utilized in conducting the College of Bus. Admin.'s RIF. *Id*.

In connection with the RIF selections, the College of Bus. Admin. issued a Total Impact Score to each College of Bus. Admin. faculty member. ECF#25, PageID#: 1665. These Total Impact Scores were purportedly used to make the RIF selections. To calculate Total Impact Scores, the College of Bus. Admin. averaged the 2018-19 and 2019-20 merit scores of each faculty member. ECF#24-1, PageID#: 1417. Faculty members were then awarded either "1" or "0" in the four categories of Service Adjustment, Critical Adjustment, Non-Tuition Revenue Generating Potential ("NTRGP") and Teaching in a High Growth Program ("TIHGP"), and these results were added to the average merit scores. *Id*. The Total Impact Score worksheets do not include any mention of affirmative action or diversity. ECF#28, PageID#: 1855-56.

The Leadership Team did not receive specific instructions on how to assess a faculty member's Service and Critical Adjustments, NTRGP and TIHGP. ECF#24-1, PageID#: 1435; ECF#22-1, PageID#: 1157. Prior to June of 2020, none of these four factors had even been used to evaluate faculty. ECF#22-1, PageID#: 1139, 1151, 1155; ECF#24-1, PageID#: 1427.

Thomson input the Total Impact Score data into a spreadsheet with the names of the faculty in the Finance Dept. ECF#24-1, PageID#: 1469. The Defendant's final RIF determinations for the Finance Dept., which were approved by the Leadership Team, were the same as Thomson's initial determinations. *Id*. In other words, the Defendant simply accepted Thomson's RIF recommendations.

Plaintiffs were the only Finance Dept. faculty who received zeros from Thomson in each of the four new evaluation categories – Service and Critical Adjustment, NTRGP and TIHGP.

ECF#20-1, PageID#: 537.  Finance Dept. faculty members Jill Bisco, Ph.D. and Barry Mulholland, Ph.D., who are both white and American-born, did not receive any zeroes.  *Id.*  Finance Dept. member Dr. Jinjing Wang received a score of 0 in only one of the four categories.  *Id.*  Finance Dept. Professors Goodell, Brisker and Newman, all of whom are white and American-born, received scores of 0 in two of the four categories, and Thomson awarded white, American-born Professor Gradisher a 0 in each category except TIHGP.  *Id.*

Due to the manner in which the Total Impact Scores were calculated, a very slight difference in scoring could produce dramatically different results.  For example, if either of the Plaintiffs had received one point in **any** of these four categories, their Total Impact Scores would have been higher than that of Gradisher.  *Id.*  Likewise, if Plaintiffs had received scores of 1 in two of the four categories OR if Gradisher, Wang or Newman had received a 0 in an additional category, the Plaintiffs' Total Impact Scores would have been higher than that of Gradisher, Wang and Newman.  *Id.*  *See also* ECF#24-1, PageID#: 1482.

1. **Service Adjustment scores**

The Service Adjustment factor in the Total Impact Score was the leadership team's "impression of what work was being done and who was doing the work."  ECF#24-1, PageID#: 1423.  This category was added by the Leadership Team to measure the "intensity" and "impact" of service.  ECF#22-1, PageID#: 1151.  In order to determine a Service Adjustment score, Thomson used his "perception" of the amount of service a faculty member was doing.  ECF#24-1, PageID#: 1471.  Thomson testified that, in determining Service Adjustment he looked at "whether they were running a program, were they responsible for events, were they active on college committees, were they active in faculty senate, were they active – ha[ve] important roles on department committees, college committees."  *Id*. at 1424-25.

Thomson testified that Dr. Goodell, a faculty member in the Finance Dept., received a Service Adjustment score from Thomson for being "very active in faculty senate" and that Goodell's role as a journal editor also played a role in Thomson's analysis. *Id*. at 1473. Goodell, however, did not serve on the Faculty Senate until August of 2020 – **AFTER the RIF**! John Goodell, Ph.D.: The University of Akron, Ohio (uakron.edu). Thus, Goodell received credit for something he did not even do.

Thomson testified that Dr. Bisco received a "1" for service because she "ran a program," held numerous events, took students on trips and contributed widely to college and department committees. ECF#25-1, PageID#: 1472. Barry Mulholland received a "1" from Thomson in this category for his oversight of the Financial Planning program and involvement in student competition committees and programs, including a big national conference called Diversitas. *Id*. Finance Dept. faculty member Wang was given extra credit for service because she "pick[ed] up the service load" from another faculty member dealing with an illness." *Id*.

The Plaintiffs each served on numerous committees in the years prior to the RIF. And unlike Goodell, Akhigbe actually was serving on the Faculty Senate at the time Thomson gave Akhigbe a "0" for Service Adjustment. ECF#30-1, PageID#: 2012. Thomson disingenuously gave Mulholland a Service Adjustment score for his involvement in student competitions, but completely ignored Balasubramnian's same contributions in this area.

Like Goodell, Balasubramnian was the Associate Editor of a business journal from August 2016 through July 2020. ECF#30-2, PageID#: 2015. Akhigbe was an Associate Editor of **five** business journals. *Id.* at 2012-13. None of this is referenced by Thomson in his Total Impact Score worksheet. ECF#24-1, PageID#: 1632. Instead, Thomson judged the Plaintiffs by a harsher standard than that used with white, American-born faculty like Goodell, Bisco and Muholland as

12

both Plaintiffs received "0" in the Service Adjustment category.  Thomson's capricious manner of scoring Service Adjustment is clear.

### 2.  Critical Adjustment scores

Critical Adjustment assessed whether a faculty member was critical to a program or area, to ensure that programs would survive.  *Id.* at 1426.  An important part of this analysis was how many other faculty had the skills to teach in an area.  *Id.* at 1427.  According to at least one member of the Leadership Team, measuring Critical Adjustment was "quite subjective." ECF#28, PageID#: 1837.

Thomson awarded Critical Adjustment scores of 1 to Finance Dept. faculty Bisco, Mulholland, Brisker, Newman and Wang.  ECF#24-1, PageID#: 1632.  The Plaintiffs both received zeroes in this category.  *Id.*

Bisco and Wang were the only members in the Defendant's Risk Management and Insurance ("RMI") program.  *Id.*  Mulholland was the only faculty member who could teach certain courses in the Defendant's Financial Planning program.  *Id.*

There is, however, no reason Brisker and Newman should have received scores of "1" in this category and that Plaintiffs should have received zeroes.  All four of these faculty members were qualified to teach Courses 302, 338, 343, 448, 473, 485 and 489, which were all core courses for Financial Management majors.[6]  ECF#30-2, PageID#: 2016.  Awarding Brisker and Newman a "1" when they taught the exact same number of core and elective courses as Balasubramnian is blatantly wrong.  Moreover, Thomson's deposition testimony that Brisker was the only person teaching Analytics at the time and that it would have been difficult to replace him was false;

---

[6] At the time of the RIF, Brisker, Newman and Balasubramnian all taught one core course for each of the three Finance majors and one senior level Financial Management major core course, that was also an elective course for Financial Planning and Risk Management & Insurance majors.  ECF#30-2, PageID#: 2016.

Brisker, Newman, Goodell and both Plaintiffs were all able to teach Financial Analytics.  ECF#30-2, PageID#: 2016; ECF#30-1, PageID#: 2013.

Thomson's machinations in May of 2020 to reassign a required course in the Defendant's MBA program from Akhigbe to Goodell also are telling.  Akhigbe had taught required MBA courses since 2013 and suddenly, in May of 2020, Thomson informed Akhigbe that he would be teaching an elective MBA course in the Fall of 2020.  The required courses Akhigbe had significant experience teaching were then assigned to a white faculty member with no prior experience teaching those classes.  *Id.*  If not for Thomson's reassignments four weeks prior to selecting Akhigbe for the RIF, Akhigbe's Critical Adjustment score would not have been zero.

Like the scores for Service Adjustment, Thomson's Critical Adjustment scores are subjective and not supported by actual data.

### 3.  Non-tuition Revenue Generation Potential

NTRGP was "the potential to generate revenue through fund-raising, grants, executive education", revenue from advisory boards, conferences, grants, and any other source not including tuition or fees.  ECF#22-1, PageID#: 1139; ECF#28, PageID#: 1831.  The Defendant testified that there is no way to measure this factor "with precision."  ECF#24-1, PageID#: 1408.  Calculations of the non-tuition revenue generation of the faculty in the Department of Finance were not even prepared in connection with the RIF selections.  *See* Defendant's Answers and Objections to Plaintiff Balasubramnian, Ph.D.'s Third Set of Interrogatories, page 5, attached hereto as Exhibit 1.  Rather, NTRGP was "just the observation" from the College of Bus. Admin. Department Chairs about which faculty are participating in College of Bus. Admin. activities.  ECF#28, PageID#: 1833.

Hanlon and Thomson even testified differently regarding the amount of time they looked at to measure a faculty member's NTRGP.  Thomson looked at the past couple of years and foreseeable future.  ECF#24-1, PageID#: 1409.  Hanlon looked at the time a faculty member had been at the college.  ECF#22-1, PageID#:  1142.

Further, there are no documents that calculate or measure non-tuition revenue generation or executive training between 2018 and 2020.  Defendant's Answers and Objections to Plaintiff's Third Set of Document Requests, attached hereto as Exhibit 2, pp. 4-6; ECF#28, PageID#: 1833-34.  Moreover, the **only** faculty in the Finance Dept. who was awarded any external grant money between 2017 and 2020 was Dr. Bisco, who was responsible for $82,210 in grant funds in that time frame.  *Id.* at 6.  Mulholland, Goodell, Brisker and Newman - who were all awarded "1" for NTRGP - raised no grant money between 2017 and 2021.

The Defendant admitted it has no records which measures revenue generated from executive training, although Thomson claimed at his deposition that Mulholland's Diversitas conference raised revenue so he awarded Mulholland a "1" for this in NTRGP.  *Id.* at 1477-78.  The Defendant, however, could provide no information regarding the amount of revenue this conference raised.

Balasubramnian was instrumental in raising more than $6,000 in prize money in the 2-1/2 years leading to the RIF, but Thomson ignored this contribution in his Total Impact Score assessment.  ECF#24-1, PageID#: 1482.  The Defendant has no evidence of white faculty Brisker, Goodell, Mulholland or Newman generating more NTRGP than either of the Plaintiffs but gives the white faculty all scores of "1" in this category.

15

### 4.  Teaching in a High Growth Program

TIHGP measured whether a faculty member taught in a program that was seeing or was expected to see increased enrollment.  ECF#22-1, PageID#: 1155.  The College of Bus. Admin.'s strategic planning documents were reviewed to determine TIHGP scores.  ECF#24-1, PageID#: 1481.  Bisco, Wang, Mulholland and Gradisher were the only Finance Dept. faculty to be awarded "1" in this category.  ECF#26, PageID#: 1679.

Despite the fact that Akhigbe received a "0" for TIGHP, the Defendant's weekend MBA program was indisputably seen as part of the University's strategy for growth.  ECF#24-1, PageID#: 1498, 1649.  Not only was the weekend MBA program a growth area, that program was generating the most revenue in the College of Bus. Admin.  ECF#20-1, PageID#: 424.  Akhigbe, moreover, had taught in that program since its start in 2013.  *Id.* at 383-84.

Financial planning and RMI also were programs which had been growing fairly strongly or identified as a potentially high growth program by the SIT.  ECF#24-1, PageID#: 1431, 1481.

### I.  The Defendant did not follow the RIF guidelines from its own HR Department.

On June 10, 2020, Hanlon and Thomson were provided with a UA Manager Guide by the University's Office of Human Resources.  ECF#24-1, PageID#: 1447; ECF#22-1, PageID#: 1168-69.  The purpose of this Manager Guide was to provide information to assist managers of employees affected by a Reduction in Force.  ECF#24-1, PageID#: 1448.

The UA Manager Guide provides in relevant part:

- It is the responsibility of administrators, managers and supervisors to carefully plan position reductions to balance business and HR considerations, including appropriate treatment of individuals affected, impact on affirmative action objectives and compliance with University policies.  ECF#24-1, PageID#: 1448-49.

- Among the list of recommended considerations in the Manager Guide is the impact of a RIF decision on diversity and affirmative action objectives; education and

experience; length of service; and documented job performance.  *Id*. at PageID#: 1452-53.

- A RIF is not to be used as a substitute for performance management or corrective action.  *Id.*

- Where multiple positions with the same job title exist within a department but only a subset of those positions has been identified for RIF, each employee in the department must be evaluated against the same factors.  *Id*. at 1452.

Thomson and Hanlon did not follow the UA Manager Guide in making the RIF selections in the College of Bus. Admin.  Thomson, in fact, did not even review the Guide until *after* selecting Akhigbe for the RIF.  *Id*. at 1447-48.  The Total Impact Scores did not consider the RIF selections impact on diversity or affirmative action objectives, length of service, salary, education or experience, despite the explicit directed in the UA Manager Guide that they do so.  ECF#24-1, PageID#: 1453, 1632; ECF#22-1, PageID#: 1172-73.

Instead of following the UA Manager Guide to make the RIF selections, according to Thomson, he and the others on the Leadership Team "instituted a holistic approach" to the process. ECF#24-1, PageID#: 1639.

The UA Manager Guide required managers making RIF selections to complete a Position Abolishment Rationale and receive HR approval for the RIF selections.  *Id*. at 1454.  Among other information, the Position Abolishment Rationales were required to include information on how the Defendant's diversity and affirmative action goals would be impacted and a comparison of employees who perform similar duties, including knowledge, skills and abilities, education and experience, quality and quantity of work, documented performance and length of service at the University.  *Id*. at 1454-55.

Neither of the Position Abolishment Rationales prepared by Thomson for Akhigbe or Balasubramnian contain information about their knowledge, skills, abilities, education,

experience, quality and quantity of work, or their length of service.  ECF#24-1, PageID#: 1626, 1659.  Further, the Position Abolishment Rationales do not refer to diversity or affirmative action anywhere.  *Id.*  The Rationales simply state that the Plaintiffs are being terminated for "reasons of economy."  *Id.*  In other words, the Defendant failed to follow its own guidelines when deciding who in the Finance Dept. to RIF.

### J.  Statistical evidence shows that faculty who had pursued grievances against the Defendant were ten times more likely to be selected for the RIF.

In 2020, the Akron-AAUP voiced concerns about the process used by the Defendant to select faculty for the RIF.  ECF#27, PageID#: 1737, 1740.  The AAUP's concerns were related to the lack of transparency about how the RIF selections were made, because this made it difficult to assess whether the process was administered evenly and fairly.  *Id.*

In 2021, Dr. Tim Matney, a tenured professor at the University, analyzed grievance activity in connection with the RIF.  *Id.* at 1734, 1742.  Virginia England Patton and Dr. James McHugh assisted Matney in this analysis.  *Id.* at 1746.  The purpose of the analysis was to determine whether "bargaining unit faculty were more likely to be on the RIF list if they had engaged in union activity by raising complaints to the University with the assistance of the AAUP."  *Id.* at 1743.

The results of that analysis showed that faculty who had brought serious complaints against the University were ten (10) times more likely to be included in the RIF.  *Id.* at 1747.  Serious complaints included complaints filed either as formal grievances, that involved discussion in labor management conference for informal resolution, were against an administrator and those which involved persistent challenges to RTP/salary challenges.  *Id.*  The Plaintiffs were both considered to be faculty members who had pursued serious complaints.  *Id.* at 1752-54.  The Plaintiffs were the only Finance Dept. faculty who had pursued serious complaints.  ECF#27, PageID#: 1753-54l ECF#30-2, PageID#: 2017.

**K.  Dr. Balasubramnian engaged in recent protected activity.**

In 2016, Drs. Balasubramnian and Gradisher, through the AAUP, pursued requests for equal pay with the University.  ECF#30-2, PageID#: 2017.  Akhigbe, as the Finance Dept. union liaison, assisted with their efforts.  *Id.*  The University ultimately granted their requests, and Balasubramnian and Gradisher received significant pay increases that year.  *Id.*  The raises, however, were not retroactive.  *Id.*

After receiving the raise, Balasubramnian attempted to recover back pay from 2012 through 2016 from the University.  *Id.*  Gradisher did not participate in these efforts for an award of back pay because she was concerned about retaliation from the University's administration. ECF#21-1, PageID#: 761.  In July of 2018 Balasubramnian's efforts culminated in filing a complaint with the Defendant's Equal Employment Opportunity/Affirmative Action Office, alleging that the University's failure to pay her back pay was discrimination on the basis of her gender, race, national origin and religion.  *Id.* at 990.  The Defendant ultimately denied Balasubramnian's EEO request in October of 2018, approximately 19 months before Balasubramnian was selected for the RIF.  *Id.* at 743, 994-99.

**L.  A few weeks before the RIF some Department Chairs indicated a preference for terminating AAUP faculty members.**

In May 2020, some of the Defendant's Department Chairs expressed a preference for eliminating faculty in the AAUP instead of those not in the union.  ECF#28, PageID#: 2003.  This preference was communicated to the Defendant's Provost, who did not respond.  Id.

**M. Dr. Akhigbe was not the highest paid faculty member in the College of Bus. Admin. or the University.**

Dr. Akhigbe's salary for the 2019-20 academic year was $236,351 for a 9-month contract.  ECF#20-1, PageID#: 495.  The Defendant paid other faculty members more than Dr.

Akhigbe for the 2019-20 academic year for 9-month contracts. These faculty and their respective salaries were Dr. Eric J. Amis, $265,090.00 and Dr. Luis Proenza, $334,750. *See* Exhibit 3, attached hereto.

### N. Defendant's Memo includes several notable misstatements.

There are numerous factual errors in the Defendant's Memo in Support of its Motion for Summary Judgment. Some of the more significant are:

- FALSE: Akhigbe was not active on college committees, faculty senate or have important roles on departments/college committees. ECF#26, PageID#: 1680.
  TRUE: As shown in Section II(A) *infra*, Akhigbe was very actively involved on college committees, faculty senate and also had important roles on college committees.

- FALSE: Akhigbe's NTRGP was clearly low, as he brought in minimal external funds to the Finance Department. ECF#26, PageID#: 1681.
  TRUE: This statement is untrue. The Defendant's own records show that the only Finance Dept. who obtained grant funding in the three years leading to the RIF was $82,210 to Dr. Bisco. Perhaps Akhigbe's NTRGP was low, but so was the NTRGP of every other member of the Finance Dept. other than Bisco. Goodell, Brisker, Newman and Mulholland all received scores of "1" for NTRGP, but the Defendant has no record that any of them received any external funding.

- FALSE: Akhigbe did not receive a point in TIHGP because the only two high growth areas in the Finance Department were risk management and insurance and financial planning. ECF#26, PageID#: 1681.
  TRUE: The weekend MBA program was also considered to be a high growth program. ECF#24-1, PageID#: 1498, 1649. **In fact, that program was generating the most revenue in the College of Bus. Admin.** ECF#20-1, PageID#: 424. Akhigbe had taught required courses in this program since it started in 2013. ECF#30-1, PageID#: 2013.

- FALSE: Akhigbe had the highest salary of any faculty member at the University. ECF#26, PageID#: 1672.
  TRUE: Two other faculty at the University received higher salaries than Akhigbe. See Section II(M), *infra*.

- FALSE: Akhigbe did not teach any required classes in the College of Bus. Admin., the College core, or any Finance majors. *Id.* at 1681.
  TRUE: Akhigbe was scheduled to teach a required MBA class in Fall 2020 until Thomson abruptly moved that class to a white faculty member on May 7, 2020, four weeks before selecting Akhigbe for the RIF. ECF#20-1, PageID#: 601.

- FALSE:  Dr. Eric Brisker was the only Finance Department faculty who could teach analytics.  ECF#26, PageID#: 1680.
  TRUE:  Numerous other faculty members in the Finance Department, including the Plaintiffs could teach analytics.  ECF#30-1, PageID#: 2013.

- FALSE: Balasubramnian was not active on college committees, or have important roles on department/college committees.  ECF#26, PageID#: 1682.
- TRUE: As shown in Section II(B), *infra*, Balasubramnian was very actively involved in numerous college committees and competitions.

## III.  **LEGAL ARGUMENT**

### A.  **The Defendant cannot meet the standard required for summary judgment in its favor.**

In order to obtain a grant of summary judgment, there must be no genuine issue of material fact.  *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Id.*  In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict.  *Id.*  To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Joyce v. Cleveland Clinic Found.*, No. 1:13CV01224, 2014 WL 4852265, at *6 (N.D. Ohio Sept. 29, 2014) (citing *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990)).

### B.  **Plaintiffs have established a prima facie case of discrimination based on race.**

Title VII prohibits discrimination with respect to an individual's "compensation, terms, conditions, or privileges of employment, because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  An employee may establish discrimination by showing that race "was a motivating factor … for the challenged employment practice."  42 U.S.C. § 2000e-2 (m).

21

The trier of fact in a disparate treatment employment discrimination case determines whether the employer, when making the employment decision, "was motivated" by the employee's race, national origin or other protected characteristic. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003). "To impose liability, a factfinder need only determine that the employer made the challenged decision based on a protected trait." *Kimble v. Wisconsin Dept. of Workforce Dev.*, 690 F.Supp.2d 765, 768 (E.D.Wis. 2010) (citing 42 U.S.C. § 2000e-2(a)(1)) (additional citation omitted).

The four elements of a prima facie case of employment discrimination where direct evidence of discrimination is lacking are: (1) plaintiff is a member of a protected class; (2) plaintiff suffered an adverse employment action; (3) plaintiff was qualified for his position; and (4) plaintiff was replaced by someone outside his protected class or was treated differently than similarly-situated non-protected employees. *Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018) (citations omitted).

In a work force reduction case, this fourth prong is modified to require a plaintiff to show "'additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.'" *Thompson v. Fresh Products, LLC*, 985 F.3d 509, 523 (6th Cir. 2021) (citing *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 420 (6th Cir. 1999) (additional citation omitted)); *Joyce, at* *12 (citation omitted). Circumstantial evidence is evidence that does not on its face show discriminatory animus, "but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture*, 317 F.3d 564, 570 (6th Cir. 2003).

The fourth prong also is satisfied in a reduction in force case [when a plaintiff demonstrates that a "'comparable non-protected person was treated better.']" *Ercegovich v. Goodyear Tire &*

*Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998) (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-82 (6th Cir. 1992) (emphasis added)); *Shah v. NXP Semiconductors USA, Inc.*, 2011 WL 9517443 *6 (E.D. Mich. March 16, 2011).

At the summary judgment stage in an employment discrimination case, a plaintiff's burden is simply "to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action 'under circumstances which give rise to an inference of unlawful discrimination.'" *Blair v. Henry Filters Inc.*, 505 F.3d 517, 528 (6th Cir. 2007) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

### 1. Statistical evidence supports a conclusion that the Defendant engaged in unlawful discrimination in selecting Plaintiffs for the RIF.

Statistics can be probative in cases involving "mass terminations." *Frappied*, 966 F.3d at 1038, 1051 (citing *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000)). To create an inference of discrimination, "'statistics must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity.'" *Thompson*, 985 F.3d at 526 (quoting *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018)) (additional quotation omitted). "The Sixth Circuit has upheld inferences of discrimination where data are offered alongside analyses describing their statistical significance." *Thompson*, 985 F.3d at 526 (citations omitted).

> "**[A] finding of statistical significance means that the data casts serious doubt on the assumption that the disparity was caused by chance.** When statisticians find a disparity between … groups to be statistically significant, they are willing to reject the hypothesis that members of the groups truly had an equal chance of receiving the outcome at issue."

*Jones v. City of Boston*, 752 F.3d 38, 43 (1st Cir. 2014) (emphasis added) (citation omitted). Courts generally find a statistic to be significant if the p-value is less than 5%. *Frappied*, 966 F.3d at 1055 (citation omitted).

The Defendant contends that Plaintiffs have no supporting statistical evidence and that the Finance Dept. sample size is too small to provide reliable statistical data, referencing samples sizes of 27 and 17 as improper.  However, the College of Bus. Admin. had at least 93 members.[7] ECF#17, PageID#: 189.  The probability value of the disparate impact analysis prepared by Tami Hannon to address the RIFs in the College of Bus. Admin. was 0.0198275, which meets the threshold of 0.05 to claim statistical significance.  Exhibit AA, ¶15.  The results of this test show that there is only a 1.98275% chance that this event arose due to random chance.  *Id.*

Moreover, the Defendant's own analyses show that the RIF on a University wide basis has a statistically significant impact on Asian employees, one of whom was Balasubramnian ECF#23-1, PageID#: 1378-80.  This means that there is sufficient evidence to claim that there is an association between race and employment status beyond that which could be attributed to random chance.

### 2. The Defendant's reliance on subjective criteria for the College of Bus. Admin. RIF selections support a finding of unlawful discrimination.

Other circumstantial evidence includes the use of subjective criteria, as this makes it difficult to distinguish between lawful and unlawful employment actions, such that their use deserves "careful[] scrutin[y]."  *Beck v. Buckeye Pipeline Services Co.*, 501 Fed. Appx. 447, 450 (6th Cir. 2012) (citing *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 93 (6th Cir. 1982)).  "'[S]ubjective evaluation processes' can be a cover for discrimination and call for 'close scrutiny' at times."  *Harris v. City of Akron, Ohio*, 836 Fed. Appx. 415, 421 (6th Cir. 2020) (citation omitted).  This is because "'[a]n employer's undisciplined system of subjective

---

[7] As the category "Non-Resident" used in the Defendant's disparate impact analysis is not defined, it is not clear if there is overlap between the members of the Non-Resident category and the other categories in the analysis.  ECF#17, PageID#: 190.  Ninety-five is the total number in the first row of the College of Bus. Admin. numbers, less Non-Residents.

decision making [can have] precisely the same effects as a system pervaded by impermissible intentional discrimination.'" *Tolton v. Day*, Case No. 19-945, 2020 WL 2542129 *24 (D.D.C. May 19, 2020) (quoting *Davis v. District of Columbia*, 925 F.3d 1240, 1248 (D.C. Cir. 2019)).

A subjective judgment resulting in discrimination against a black plaintiff is unlawful "regardless of whether the employer consciously intended to base the evaluations on race, or simply did so because of unthinking stereotypes or bias." *Thomas v. Eastman Kodak*, 183 F.3d 38, 58 (1st Cir. 1999). Particularly close scrutiny is required when an employer's decision is subjective, **and** the decision makers were not members of the minority group. *Scott v. Eastman Chemical Co.*, 275 Fed.Appx. 466, 476 (6th Cir. 2008) (quoting *Thurman v. Yellow Freight Sys.*, 90 F.3d 1160, 1167 (6th Cir. 1996)). *See also Ceglia v. Youngstown State Univ.*, Case No. 14AP-864, 2015-Ohio-2125, 38 N.E.3d 1222, 1235, ¶47 (10th Dist.) (citation omitted).

The Defendant's representatives testified that their approach to the College of Bus. Admin. RIF was holistic and subjective. With respect to the Finance Dept., moreover, the two decision makers (Thomson and Hanlon) were white and American-born and, therefore, not members of either protected group. The College of Bus. Admin. did not follow the explicit RIF guidelines from the University's HR Department. Despite specific instructions to consider affirmative action objectives, impact on diversity, education and experience and length of service, the College of Bus. Admin. never mentions any of these factors in making the RIF selections. The Plaintiffs' Position Abolishment Rationales moreover do not include any information on how the Defendant's diversity and affirmative action goals would be impacted, a comparison of employees who perform similar duties or length of service with the Defendant.

**C. Balasubramnian has established a prima facie case that she was selected for the RIF in retaliation for engaging in protected conduct.**

To establish a prima facie case of retaliation under Title VII, 42 U.S.C. § 2000e-3(a), a plaintiff is required to demonstrate that: "(1) he engaged in activity protected by Title VII; (2) his exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *George v. Youngstown State Univ.*, 966 F.3d 446, 459 (6th Cir. 2020) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714 (6th Cir. 2014)). Like disparate treatment claims, once a plaintiff has established a prima facie case of retaliation, the burden shifts to the employer to show a legitimate, non-discriminatory reason for the adverse action. *Joyce*, at *13 (citation omitted).

To prove causation, sufficient evidence must be produced from which "an inference could be drawn that the adverse action would not have been taken had the plaintiff" not engaged in protected activity. *George*, 966 F.3d at 460. This burden is not onerous at the prima face stage, and can be shown through "'evidence that the defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.'" *Id.* (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

One way to show the requisite causation is temporal proximity between the defendant's adverse action and the plaintiff's protected activity. *Faure v. Ohio State Univ.*, Case No. 2:19-cv-1949, 2021 WL 5918914, *13 (S.D. Ohio Dec. 14, 2021) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). A plaintiff can also show causation if temporal proximity is combined with other evidence of retaliatory conduct. *George*, 966 F.3d at 460 (citing *Mickey*, 516 F.3d at 525). A temporal gap between protected activity and the retaliatory action can be justified

if there was no prior opportunity for the employer to retaliate.  *George*, 966 F.3d at 468.  *See also Lyons v. Tecumseh Local School District*, Case No. 3:23-cv-74, 2023 WL 6442825, *6 (S.D. Ohio Oct. 3, 2023).  A span of more than six months between protected activity and adverse action does not operate to categorically preclude a finding of causation.  *George*, 966 F.3d at 460 (quoting *Sharp v. Aker Plant Servs. Grp., Inc.*, 600 F.App'x 337, 341 (6th Cir. 2015)).

**1. Temporal proximity and other circumstantial evidence further support Balasubramnian's claim of retaliation.**

Balasubramnian filed an EEO complaint with the Defendant in July of 2018, alleging that the University's failure to pay her back pay from 2012 to 2016 was unlawful discrimination. ECF#21-1, PageID#: 990.  The Defendant ultimately denied Balasubramnian's EEO request in October of 2018, approximately 19 months before Balasubramnian was selected for the RIF.  *Id.* at 743, 994-99.

While there is not close temporal proximity between Balasubramnian's EEO complaint and the RIF, Matney's analysis and the Defendant's retention of Dr. Gradisher must also be considered.  Matney's analysis showed that faculty who had brought serious complaints against the University were ten (10) times more likely to be included in the RIF.  ECF#28, PageID#: 1747. Balasubramnian and Akhigbe were the only Finance Dept. on Matney's list.  ECF#30-1, PageID#: 2014.  They were also the only Finance Dept. faculty who were RIFed.

Like the race and national origin claims, Balasubramnian's case for retaliation is also supported by the Defendant's improper use of subjective criteria and failure to follow the RIF guidelines from its own HR Department.

**D.  The Defendant's purported legitimate business reason is pretextual.**

In order to survive summary judgment, a plaintiff must provide sufficient evidence to permit a jury to conclude that an employer's stated reason for a discriminatory action is pretextual.

*Browning v. Dep't of the Army*, 436 F.3d 692, 695 (6th Cir. 2006); *Joyce*, at *16 (citation omitted). This means evidence from which a jury could "reasonably reject [the employer's] explanation of why it fired [the employee]." *Joyce*, at *12 (quoting *Chen v. Dow Chemical Co.*, 580 F.3d 394, 400 (6th Cir.2009)).  Pretext may be shown by demonstrating that the employer's reason "' (1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'" *Thompson*, 985 F.3d at 522 (quotation omitted).

A plaintiff "must come forward with evidence that the defendant's reason for the employment action is false," but is not required to "present independent evidence that the proffered reason is pretext for [ ] discrimination." *Briggs v. Univ. of Cincinnati*, 11 F.th 498, 509 (6th Cir. 2021) (quoting *Sutherland v. Michigan Dep't of Treasury*, 344 F.3d 603, 615 (6th Cir. 2003) (additional citation omitted)).  "[A] plaintiff's *prima facie* case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Briggs*, 11 F.4th at 509 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).  Summary judgment is inappropriate when "there is enough evidence to rebut, but not to disprove" an employer's proffered rationale. *Briggs*, 11 F4th at 513 (citing *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 532 (6th Cir. 2007)).

The Plaintiffs have presented evidence that the Total Impact Scores which formed the basis for the Finance Dept.'s RIF selections were not based on fact.  The Plaintiffs have also demonstrated that a white Finance Dept. member, Dr. Melinda Newman, should have been selected for the RIF before a Total Impact Score was even calculated for her because she was Out of Status.

Thomson determined that the Plaintiffs were worthy of only zeroes in the categories of Service and Critical Adjustment, NTRGP and TIHGP. Plaintiffs were the only Finance Dept. who

received only zeroes, and if they had received a 1 in just one category, they both would have received higher Total Impact Scores than Dr. Gradisher.  Both Plaintiffs were deeply involved in University committees throughout their time at the University, and in 2020 when the RIF occurred. Thomson gave Goodell a Service score of 1 because of his active involvement in the Faculty Senate – which did not even occur until after the RIF.  Goodell's role as a business journal editor was also considered, but Akhigbe's role as an Associate editor of **five** journals and Balasubramnian's role as an Associate editor was completely ignored by Thomson.

Balasubramnian had brought in prize money and visibility to the University, but received no credit by Thomson for doing so, receiving a "0" in NTRGP.  White faculty Mulholland, Goodell, Brisker and Newman brought in no NTRGP either, but were awarded with scores of "1". Despite plenty of evidence that the weekend MBA program was one of the Defendant's high growth programs, Akhigbe received a score of "0" in TIHGP.

The Defendant's Total Impact Scores are premised on false premises.  The Plaintiffs have presented sufficient evidence that these Scores were pretexts for unlawful discrimination.

## IV. <u>CONCLUSION</u>

The Plaintiffs have statistical evidence which shows that the RIF selections of African Americans, Asians and those who had pursued serious complaints against the University was significant.  The process used by the College of Bus. Admin. to select faculty for the RIF also lent itself to claims of unlawful discrimination, as RIF selections were made without following the RIF guide from the Defendant's Human Resources' Department and the faculty were evaluated "holistically," relying on subjective factors which were unsupported by either documents or data. The analysis of these factors by white administrators, moreover, was simply wrong in several respects.  The College of Bus. Admin.'s Total Impact Scores ultimately hurt the Plaintiffs and benefitted white, American born faculty.

The Defendant has not proven its right to summary judgment on the employment discrimination claim of Plaintiffs Aigbe Akhigbe, Ph.D. and Bhanu Balasubramnian, Ph.D.

Respectfully submitted,
COHEN ROSENTHAL & KRAMER LLP

/s/ Ellen M. Kramer
Ellen M. Kramer (0055552)
*emk@crklaw.com*
Joshua R. Cohen (0032368)
*jcohen@crklaw.com*
COHEN ROSENTHAL & KRAMER LLP
3208 Clinton Avenue
Cleveland, Ohio 44113
216-815-9500 [Telephone]
216-781-8061 [Facsimile]

*Counsel for Plaintiffs Aigbe Akhigbe, Ph.D.*
*and Bhanu Balasubramnian, Ph.D.*

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(f)

Pursuant to Local Rule 7.1(f), Ellen M. Kramer, as trial counsel for Plaintiffs in this case, certifies that this case is assigned to the standard track, and that the page limitation has been extended to thirty pages by order of this Court.  (See Order [non-document] dated November 3, 2023).  The preceding Brief does not exceed thirty pages.

/s/ Ellen M. Kramer
Ellen M. Kramer (0055552)

## <u>CERTIFICATE OF SERVICE</u>

I certify that on this 20th day of November 2023, a copy of the foregoing **Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment** was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.

/s/ Ellen M. Kramer
Ellen M. Kramer