A. UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AIGBE AKHIGBE, Ph.D., *et al.*, | ) | Case No. 5:22-CV-01990 |
| | ) | |
| Plaintiffs, | ) | JUDGE PEARSON |
| | ) | |
| v. | ) | MAG. JUDGE HENDERSON |
| | ) | |
| UNIVERSITY OF AKRON, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

DAVE YOST (0056290)
Attorney General of Ohio

Drew C. Piersall (0078085)
ZASHIN & RICH CO., L.P.A.
17 South High Street, Suite 900
Columbus, OH 43215
Telephone: (614) 224-4411
Facsimile: (614) 224-4433
dcp@zrlaw.com

Sarah J. Moore (0065381)
ZASHIN & RICH CO., L.P.A.
950 Main Avenue, 4th Floor
Cleveland, OH 44113
Telephone: (216) 696-4441
Facsimile: (216) 696-1618
sjm@zrlaw.com

*Attorneys for Defendant University of Akron*

I. INTRODUCTION

"When an employer implements a RIF, the unfortunate fact is that someone has to go. It is not the prerogative of the courts to engage in the post-hoc management of the employer's internal affairs by second-guessing how personnel could have been more equitably allotted, or cost-savings better realized." *Norbutta v. Loctite Corp.*, 1 Fed. Appx. 314 (6th Cir. 2001). This is precisely what Plaintiffs ask this Court to do. They have no evidence of any discriminatory or retaliatory animus exhibited by anyone at UA. Instead, Plaintiffs rely on statistics derived from a sample size that is too small according to black letter law to satisfy the fourth prong of their *prima facie* discrimination cases. When it comes to pretext, Plaintiffs do little more than disagree with the Total Impact Score criteria used by the College of Business and attempt to weaponize their "subjective" nature, despite the fact that Sixth Circuit case law approves the use of subjective criteria in a RIF. Plaintiffs then disagree with the Scores assigned to them, which is not a recognized, permissible analysis – the focus should be on the *legality* of the criteria used, not Plaintiffs' views of their own scores. A manifest *lack* of evidence dooms both Plaintiffs' claims.

Akhigbe drops his retaliation claim. And Balasubramnian cannot establish the causal connection element of her *prima facie* case because two years passed between her protected activity and her RIF. Further, the alleged retaliator had nothing to do with her RIF and she presents no evidence of any kind to establish this fourth element. No evidence of pretext exists.

It is not in dispute that UA faced a $65M structural budget deficit because of the COVID-19 pandemic. Drastic steps needed to be taken, and it is unfortunate that many employees lost their jobs. While Plaintiffs may disagree with UA's decisions, the criteria UA used to implement the RIF, and the Total Impact Scores assigned to Plaintiffs as part of this implementation, they fail to establish that UA discriminated or retaliated against them. Plaintiffs' claims should be dismissed.

1

## II.   FACTS, BRIEFLY REVISTED

Plaintiffs recite their credentials and lengthy service, but neither Plaintiff has identified an issue of material fact showing that their retention would have moved the proverbial "needle" in the two critical needs that the College of Business ("College") identified: <u>money</u> and <u>students</u> (who, in turn, generate money). It is not in dispute that, absent substantial budget cuts, the COVID-19 pandemic threatened the collapse of UA's academic programs and its very existence.

Akhigbe characterizes himself as an "outstanding" faculty member, emphasizing his length of service, his committee assignments, and his work as a Union liaison.[1] He concedes that as an Endowed Chair, his workload was oriented heavily on research and that he taught a significantly reduced courseload. (Opp. Memo, pp. 2-3). Notably, Akhigbe did not dispute that his research brought in zero money to UA and had no material importance in the face of UA's need to increase revenues and enrollment. Akhigbe took issue with his salary ranking within UA, but does not assert any material fact dispute about his more-than $300,000 total earnings.

Balasubramnian focuses on her institutional service as a past faculty advisor for a student competition team. (Opp. Memo, p.4). Curiously, in a case involving a $65M projected campus-wide budget shortfall and the termination of nearly two hundred positions across UA, Balasubramnian focuses myopically on the credit she deserves for bringing $6,250 in prize monies into the College over a several-year period – monies which students earned. Nothing about this money creates an issue of material fact on the question of discrimination or retaliation – nothing.

The remainder of Plaintiffs' "fact" summary undulates between any number of Plaintiffs' self-centered perceptions and opinions about the RIF criteria, descriptive statistics, and other

---

[1] As explained *infra*, the proper focus is not on the Plaintiffs' self-assessments, but on the evaluator's (James Thomson) perception of their performance. Furthermore, Plaintiffs, despite their glowing self-reviews, cannot dispute their low teaching scores: they were two of only three Finance faculty members that did not receive a score of 5/5 in this area.

2

irrelevant material (including bizarre allegations of anti-union animus that has no relevance to the Title VII claims at issue in this case).  Without wading into the thicket of every mischaracterization and tangent in Plaintiffs' opposition, UA will address several notable points.

> A. **Plaintiffs' Reliance on UA's Statistical Analysis Does Not Create an Issue of Material Fact on Discrimination or Pretext**

A significant portion of the statement of facts is devoted to a lay analysis of certain RIF-related statistical analyses prepared by UA's Director of EEO/AA, Tami Hannon.  Plaintiffs cite the EEOC's threshold assessment for the potential existence of disparate impact, the 4/5ths or 80% rule, and then all but admit to cherry picking favorable data points from Hannon's spreadsheets.

Plaintiffs alternate between viewing statistics at the College and UA levels in an effort to dodge obvious problems with sample size and data reliability, but in doing so, they try to convince this Court to hyperfocus on College Level or University Level only – playing up the one perceived as favorable to their claims:  African American status may have statistical significance at the College level, so Plaintiffs highlight this, but ignore the lack of significance at the University level.  Similarly, Asian status lacks significance at the College level, but may have significance at the University level, so Plaintiffs downplay the unfavorable and play up the favorable.

As discussed *infra*, and as recognized by this Court, a sample size of 2 separated Finance Department faculty members, and 9 separated College faculty members, is far too small to elicit any meaningful statistical analysis as a matter of law.  Additionally, University-wide level data has no legal significance because UA made these RIF decisions at the College level.

> B. **Plaintiffs' Armchair Quarterbacking of the RIF Criteria**

Plaintiffs take rhetorical shots at the unenviable task assigned to the College's Strategic Initiative Team ("SIT"), who were asked to identify the RIF criteria (which they called Total Impact Scores), and then assigned Scores to College faculty members.  Plaintiffs insinuate that the

3

RIF criteria utilized were only "purportedly used to make the RIF selections" (Opp Memo, p. 10), but cite no evidence to support this claim. The record clearly establishes the RIF criteria were used.

Plaintiffs also try to undermine the integrity of the SIT's work by insinuating it "rubber-stamped' Thomson's recommendations. However, Plaintiff did not point to any evidence in the record that the other SIT members wholly failed to consider Thomson's suggested Finance faculty Scores. Indeed, given peer review and critique remain hallmarks of university academia, such an inference lacks any foundation within or outside the record. The fact remains: the SIT adopted Thomson's scores – this act does not create an issue of material fact as to discrimination or pretext.

Plaintiffs, had they been tasked with identifying which colleagues must be separated, might have chosen different criteria, weighted them differently, assigned scores differently, etc. This type of armchair-quarterbacking is insufficient to impugn the decisions of Thomson/SIT, and it certainly is insufficient to impute discriminatory/retaliatory animus to the SIT, in whole or in part.

While Plaintiffs took shots at Thomson's assigned Scores, they *never* attempt to explain why Thomson had racial, national origin, or protected-activity related animus toward them – the appropriate analysis. Furthermore, Plaintiffs acknowledge repeatedly that they were not the only persons impacted negatively in some of the categories by the SIT's qualitative judgments about the faculty: **other faculty outside the protected class(es) received "zeros."** Plaintiffs also downplay the rapid timeline in which a decisional framework had to be created, applied, and submitted for the RIFs. (Opp Memo, p. 11). Time was of the essence given the directives of UA's Board of Trustees. While Plaintiffs (with the benefit of lengthy hindsight and personal motivation) might second-guess or substitute their own judgments, they do not identify any competent evidence that the SIT manipulated any scores with intent to discriminate or retaliate. At most, their argument boils down to this: if Akhigbe and Balasubramnian had done the RIF scoring, it

4

would have been done better. But Plaintiffs claims cannot survive a MSJ merely because they believe the decision was hasty, or that certain facts were missed or not given the credit *they* believed those facts were due. A quick rundown is in order.

**Service adjustment ("SA").** Plaintiffs complain about the subjectivity inherent in the analysis of this factor – emphasizing words like "impression" and "perception." (Opp Memo, p. 11). But Thomson testified that for SA, he considered discrete aspects of faculty performance. Plaintiffs cited his testimony on this point. *Id.* Thomson was not merely looking at a mechanical counting of a number of committee assignments (which is precisely what Plaintiffs tout), but focused on the "intensity of activity." (Thomson Dep. 27). Plaintiffs flatly state that they serve on any number of committees – which nearly all UA faculty members do. To be clear, this was not a check-box exercise. Thomson analyzed the level of service, and Plaintiffs fell short of Bisco, Mulholland, Goodell, and Wang (the only four who received a point in this category). Plaintiffs provided no evidence that their service intensity aligned with these four; nor did they address the fact that faculty not in the protected class also did not receive a point in the SA category.

**Critical adjustment ("CA")**. Plaintiffs were not critical to any Finance or College degree program. They largely do not dispute this, other than Akhigbe's claims that he taught course no. 674 in the Weekend MBA program, which is addressed below.

Five faculty members received a point for CA. Plaintiffs agree with three of these scores, but dispute two scores (Brisker and Newman). (Opp Memo, pp. 12-13). Plaintiffs' acknowledgement that three scores were correct is a fatal concession that the RIF decision CA criterion is legitimate – they just believe that two faculty members should not have received a point. Plaintiffs wholly ignore the fact that other faculty members outside the protected class did not receive a point for CA. Plaintiffs' impressions of who they think taught core vs. elective

5

courses misses the mark and fails to create any issue of material fact.

**NTRGP**. Plaintiffs fault this factor as imprecise (Opp Memo, p. 14) and impugn the SIT's analysis because they say the SIT did not calculate historical **amounts** of non-tuition revenue. Plaintiffs know it is "fairly rare" for Finance faculty to receive grants -- this is not in dispute. Thomson explained the NTRGP identified whether faculty members had the ability (i.e., potential) to bring in revenue through executive programs. (Thomson Dep. 32-33). The analysis is not hard: Plaintiffs did not teach in the executive programs.[2] (Akhigbe Dep. 172; Balasubramnian Dep. 115).

From a historical perspective, Akhigbe did not generate any non-tuition revenue, and Balasubramnian can only point to $6,250 of student money as her non-tuition revenue generation. (Opp Memo, p. 15). Those monies were secured by *students* under Balasubramnian's advisement, not by Balasubramnian herself, and those monies were no longer coming in because she stopped advising this group of her own volition in 2019. (Balasubramnian Dep. 65-66).

**TIHGP**. Plaintiffs mount a feeble assault on the TIHGP factor - a wholly objective category: the College's 2018-2019 strategic planning identified all high growth programs, so either you taught in an identified program, or you did not. Akhigbe[3] contends he should have received a point for teaching in the Weekend MBA program, which was identified as a "high growth" program. But Thomson was clear: although Akhigbe had taught course no. 674, a faculty vote in Fall 2019 eliminated it from the program. (Thomson Dep. 103-04, 123). Thus, at the time Thomson/SIT analyzed TIHGP, Akhigbe did not teach a required course in the Weekend MBA program, and thus received no points in TIHGP. Plaintiffs do not contest these underlying facts.

Akhigbe makes much of Thomson's course scheduling change for Fall 2020. (Opp. Memo,

---

[2] Akhigbe claimed that one of his courses had high school teachers enrolled and should have been counted as executive education. Akhigbe presented no evidence that this fact constituted proof that he had the ability to bring in non-tuition grant monies into the College to justify award of an NTRGP point.
[3] Balasubramnian does not assert she deserves a point in this particular area. (Opp. Memo, p. 16).

6

p. 9). However, Akhigbe did not rebut the fact that at the time Thomson made this teaching change in early May 2020, Thomson had <u>no</u> idea how deep UA's budget cuts would be. (Thomson Dep. 96). Thomson only knew then that he could not utilize visiting professors and had to redistribute those courses. *Id.* Akhigbe simply cannot establish an issue of material fact as to discrimination or retaliation – Thomson assigned/reassigned courses in the Weekend MBA program at a time *before* he learned UA would implement a campus-wide faculty RIF.

### C. UA's RIF Guide

Plaintiffs note that Hanlon and Thomson received the RIF guide on June 10, 2020, and second-guess their perceived lack of alignment between the guide and the Total Impact Scoring process. Plaintiffs claim Thomson did not follow the guide, therefore failing to consider diversity, which is mentioned in the guide. However, this is a half-truth and fails to reflect that a College employee had, in fact, been tasked with ensuring the RIF reductions complied with EEO guidelines. (Thomson Dep. 54-55; Hanlon Dep. 48-49). The undisputed fact remains – UA examined the RIF under its EEO policies *before* its Board of Trustees made its RIF decisions. Plaintiffs ask this Court to ignore this fact on a record that confirms that both a COB employee and Hannon performed this task. Given Plaintiffs have actually *used* small portions of Hannon's analysis in their oppositional memorandum, their argument as to the UA RIF Guide falls flat.

### III. LAW AND ARGUMENT

#### A. Plaintiffs' Race and National Origin Discrimination Claims Fail

Plaintiffs have no direct evidence of discrimination and proceed under an indirect evidence theory. (Opp. Memo, p. 22, PAGEID#2044). The parties agree for purposes of the MSJ that Plaintiffs meet the first three elements of their respective *prima facie* discrimination claims. And the parties agree that the fourth element is modified in a RIF analysis – it includes a heightened

7

burden for a plaintiff to "present additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for impermissible reasons." *Thompson v. Fresh Prods., LLC*, 985 F.3d 509, 523 (6th Cir. 2021) (internal citations omitted). In analyzing this fourth prong, "[t]he guiding principle is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff because of" the plaintiff's protected class status. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990).

1. **Plaintiffs Cannot Establish the Modified Fourth Prong of a *Prima Facie* Case**

To establish this prong, Plaintiff cites two things: (1) purported "statistical evidence," and (2) purported subjective criteria utilized by the College to arrive at the Total Impact Scores. (Opp. Memo, pp. 23-25). Plaintiffs' "statistics" fall woefully short of their burden for simple reasons.

UA argued in its MSJ (p. 16) that the sample size was too small as a matter of law to provide any reliable data for the purposes of a fourth prong analysis. To reiterate, this Court has held (in the context of the exact same UA RIF, no less) that **6** laid off employees is a "relatively small sample size[] to be suspect and incapable of supporting an inference of discrimination." *Li v. Univ. of Akron*, N.D. Ohio Case No. 5:21-cv-2277, 2023 U.S. Dist. LEXIS 108342, *25, FN9 (N.D. Ohio June 22, 2023) (citing *Thompson,* 985 F.3d at 526). Recently, the Sixth Circuit stressed the "importance of sample size" in analyzing the fourth prong. *Id.* at 526. The *Thompson* Court held that the sample size of **5** terminated employees was insufficient. *Id.* (*compare Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018) (**27** insufficient), and *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (**17** "suspect"), with *Barnes*, 896 F.2d at 1462-63, 1467 (**153** and **165** reliable). Here, there were **9** employees laid off in the College and **2** in the Department.

Plaintiffs claim that the College "had at least 93 members," and that this number is sufficient in comparison to the 27 and 17 employees at issue in *Peeples* and *Simpson*, respectively.

8

(Opp. Memo, p. 24). But analyzing a pool of employees **potentially susceptible to RIF** is not legally supportable. As made clear by *Thompson*, *Peeples*, *Simpson*, and this Court in *Li*, the correct focus is on the *actual* **number of employees laid off**. The total of 9 impacted employees (or 2) falls short of statistical significance. Plaintiffs' argument as to sample size fails.

Even if the sample size were sufficient, Plaintiffs unpersuasively cherry-pick from statistical analyses conducted by UA employee Tami Hannon (attached to a stipulation, ECF #17 and to Rex Ramsier's deposition, ECF#23-1) in an effort to support their position. Plaintiffs failed to retain or utilize the services of a qualified expert to opine on this data. Instead, Plaintiffs pass off their own lay observations and interpretations of selectively-chosen data points. Plaintiffs cannot merely submit, via a memo contra, a statistical argument which is necessarily expert testimony that cannot be cross-examined. "Statistical analyses by plaintiffs' counsel are insufficient evidence to support a prima facie disparate impact case." *Smith v. Allstate Ins. Co.,* 2005 U.S. Dist. LEXIS 13015, 2005 WL 1540221, *10 (N.D. Ohio, 2005), *aff'd* 195 Fed. Appx. 389 (6th Cir. 2006). *See also, Johnson v. United States HHS,* 1992 U.S. Dist. LEXIS 22673, *47 (N.D. Ohio 1992) (internal citation omitted):

> [P]laintiffs' counsel is not and never qualified himself as an expert in statistics. He purports to summarize data, run percentages, and perform statistical computations on data although he is not qualified to do the same and cannot be cross-examined on his background or methods. As such, plaintiffs' attempt to prove a disparate impact case based on their attorney's statistical analysis must fail at the outset.

<u>Notably, Plaintiffs chose not to depose Hannon.</u> Had Plaintiffs taken Hannon's deposition, they would have learned how to interpret the documents they manipulated and understood no basis exists in law for their use to try to establish pretext. Specifically, Hannon would explain that:

1) Hannon utilized the UA data set then available in June and July of 2020 to perform a Fisher's Exact and Chi-Square Test at a University-level, College-level, and Unit-level for

9

the entire institution. (Hannon Dec., ¶5, referencing ECF#17 & ECF#23-1 pp. 1372-1381).

2) The Fisher Exact Test allows comparison of two variables for association based on an exact probability of distribution to indicate whether to accept or reject a null hypothesis (i.e., *that the observed result or a more extreme result could have occurred simply due to chance*). A value below 0.05 indicates the data does not support that hypothesis. At the <u>Unit-level</u>, the p-value as to African Americans listed on Hannon's document does <u>not</u> indicate that there is only a 1.989275% chance that this difference arose because of random chance, as Plaintiffs contend. (Opp. Memo., p. 6). <u>Rather, Hannon's data analysis reflects an observed result of 0.01989275 (which is less than .05) and does not support the hypothesis.</u> It would <u>not</u> be appropriate to rely on this as <u>statistically</u> significant standing alone. Similarly, the p-value at the Unit-level does not represent statistical significance. (*Id.* at ¶6).

3) Hannon used a pool of total employees **potentially susceptible to the RIF action** and did not focus her disparate impact analysis on the **actual number of employees laid off.** (*Id.* at ¶7). Consequently, the precedent in *Thompson, Peeples, Simpson,* and *Li* preclude use of Hannon's analysis by Plaintiffs to present a pretext argument.

Plaintiffs also claim that they can demonstrate the fourth prong because the Total Impact Scores were "subjective criteria." (Opp. Memo, p. 24). As an initial matter, where the alleged use of subjective criteria fits into a fourth prong analysis is not explained by Plaintiffs. The cases cited by both parties on this topic analyze "subjective criteria" at the pretext stage. Both parties cite *Beck v. Buckeye Pipeline Servs.*, 501 Fed. Appx. 447, 450 (6th Cir. 2012), but this case helps UA and not Plaintiffs. In *Beck*, which analyzed this issue at the pretext stage, the employer utilized far more generic "subjective criteria" than those utilized by UA, including: whether an employee was "a good listener and communicator[,] . . . willing to work in a team[,] . . . accepts

accountability[,] . . . [and] works with speed, energy and efficiency." *Id.* In *Beck*, the plaintiff challenged the use of purported subjective criteria. He could not impugn the criteria as discriminatory though, because "[n]one of these criteria discriminates based on gender or age." *Id.*

As opposed to the generic criteria used by the employer in *Beck*, the College's Total Impact Scores used by Thomson/SIT directly addressed UA's budget crisis: the College needed money and students to stay afloat, and the categories attempted to capture these efforts while not crippling the delivery of certain programs and courses. Notably, the *Beck* Court concluded that the use of the four subjective criteria were not discriminatory, and held, "When all is said and done, the use of subjective evaluation criteria does not by itself show discrimination, **particularly in a reduction in force case**." *Id.* at 451 (emphasis added).

2. **Plaintiffs Fail to Demonstrate any Pretext for Discrimination.**

Even if Plaintiffs can establish a *prima facie* case, which they cannot, the burden shifts to UA to articulate a non-discriminatory reason for the adverse action. Here, Plaintiffs do not challenge the financial circumstances that resulted in the RIF. This meets UA's burden. *Hopkins v. Elec. Data Sys. Corp.*, 196 F.3d 655, 662 (6th Cir. 1999). Instead, Plaintiffs utilized the first *Manzer* factor in an attempt to demonstrate pretext: they contend that their terminations had "no basis in fact" because they disagree with the Scores assigned to them, and argued Melinda Newman should have been selected for the RIF because she was Out of Status. (Opp. Memo, p. 28).

Newman was not Out of Status. This is the first time this argument has been raised, and it is simply untrue. Newman had the requisite number of scholarly activities as prescribed by the accrediting body to maintain status. (Thomson Declaration,¶5-9).

Plaintiffs' focus on their assigned Scores is not the proper analysis. An employee's evaluation of his own performance or qualifications is "irrelevant to the [] discrimination inquiry

11

— **what matters is [his supervisor's] perception of [his] qualifications**." *Browning v. Dep't of the Army*, 436 F.3d 692, 698 (6th Cir. 2006) (emphasis added); *see also, EEOC v. Lucent Techs., Inc.*, M.D. Tenn Case No. 3:04-cv-882, 2006 U.S. Dist. LEXIS 3022, *19-20 (E.D. Tenn. Jan. 20, 2006) ("it is not the court's place to second-guess the defendant's business practices, absent some proof that this method of rating employees is illegal. (citing *Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) (finding that "it is inappropriate for the judiciary to substitute its judgment for that of management"); *see also White v. Columbus Metro Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005)[4] (finding that "an employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext")); *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 522 n.7 (6th Cir. 1991) ("Courts must not second guess whether the employment decision was 'wise, shrewd, or prudent.'"). The appropriate focus is on whether the rating system used by UA was legally impermissible; Plaintiffs have presented <u>no</u> evidence of that whatsoever.

Moreover, Thomson's "perceptions" are demonstrably based in fact. For example, it is undisputed that course no. 674 was no longer required in the Weekend MBA program; thus, Akhigbe was assigned a zero in TIHGP. The fact that Akhigbe no longer taught required courses in the program supports Thomson's evaluation. Plaintiffs' self-evaluation on their entitlement to a point for SA is not a basis to disturb Thomson's decision to evaluate the intensity of that service when scoring SA, nor can it be utilized as a basis to infer discrimination or pretext.

Plaintiffs have failed to demonstrate that the Scores were unlawful. Plaintiffs have not established discrimination or pretext, and this case must be dismissed as a matter of law.

B. **Dr. Balasubramnian's Retaliation Claim Fails**

Akhigbe has abandoned his retaliation claim, as it is not mentioned anywhere in the Opp.

---

[4] Plaintiffs' claim that the UA Manager Guide was not followed, which is untrue (Thomson Dep. 60-61), is insufficient to demonstrate pretext, as made clear by the Sixth Circuit in *White*.

12

Memo. The Sixth Circuit's "jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when [he] fails to address it in response to a motion to summary judgment." *Brown v. VHS of Mich.,* 545 F. App'x 368, 372 (6th Cir. 2013).

Turning to Balasubramnian's retaliation claim, she proceeds under an indirect evidence theory. (Opp. Memo, p. 26). For purposes of this MSJ, the parties agree that Balasubramnian meets the first three elements of a *prima facie* retaliation claim. Thus, her *prima facie* case turns on the fourth element, which requires "a causal connection existed between the protected activity and the materially adverse action." *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

The parties agree that Balasubramnian: (a) filed her internal complaint on July 11, 2018 (Balasubramnian Dep. 54; Ex. MM); and (b) did not engage in any further protected activity after July 11, 2018. (Balasubramnian Dep. 60). Thus, 24 months passed between her last instance of protected activity in July 2018 and notice of her separation in July 2020.[5] While this passage of time does not foreclose a retaliation claim, it does make it difficult: she cannot rely on temporal proximity alone to establish a *prima facie* case. If "some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Bledsoe v. Tenn. Valley Auth. Bd. of Dirs.*, 42 F.4th 568, 588 (6th Cir. 2022) (internal citation omitted). The passage of two years (or 19 months) far surpasses any standard that could be deemed temporally close. *Id.* at 589 (three months "is probative of retaliatory motive," whereas "more than a year" is not). Balasubramnian recognizes as much. (Opp. Memo, p. 27).

Balasubramnian's "other evidence of retaliatory conduct" appears to be the retention of

---

[5] Not that it is of major import, but Balasubramnian contends that 19 months passed between the issuance of the UA EEO's determination in October 2018 and her RIF. (Opp. Memo, p. 27, PAGEID#2049). Legal precedent places the focus on when a plaintiff engages in protected activity, not when the investigation report into that activity is released.

13

Suzanne Gradisher, and Tim Matney's analysis regarding faculty members who brought "serious complaints." (Opp. Memo, p. 27). Before turning to these factors, it bears mentioning what Plaintiff **did not** analyze: namely, Rex Ramsier's lack of involvement in her RIF decision. Balasubramnian does not dispute that she had attributed the alleged retaliatory animus arising from her pay increase complaint to Ramsier, whom she *believes* was involved in the RIF selection process. (Balasubramnian Dep. 220, 246-47). But Balasubramnian also does not dispute the record evidence that confirms Ramsier no longer served as Provost and had no input in the RIF as it relates to Balasubramnian. (Ramsier Dep. 8-10). In other words, the alleged retaliator in her eyes played no role in the alleged retaliation -- Balasubramnian never addressed this point.

The retention of Gradisher as alleged evidence of retaliation is puzzling. To recap, both Balasubramnian and Gradisher requested pay increases in 2016. If UA truly possessed some sort of retaliatory animus towards Gradisher/Balasubramnian, it had an odd way of showing it: both "received significant pay increases that year." (Opp. Memo, p.19). Gradisher advocated for a pay increase (which she received), and was not selected for the RIF. This confirms UA had no retaliatory animus as to the 2016 pay increase complaints.

Further, Matney's analysis is not competent summary judgment evidence for any number of reasons. First, Matney described the sole function of his analysis as follows: "This report summarizes data collected by the Akron-AAUP Grievance Officer to answer the question of whether BUF [bargaining unit faculty] were more likely to be on the reduction in force ("RIF") list if they had engaged in union activity by raising complaints to the University with the Akron-AAUP's assistance." (Matney Dep. Ex. 1, p. 1). Matney described his inquiry as: "whether or not faculty members who had previous grievances or issues with the University were disparately impacted." (Matney Dep. 13). Thus, by Matney's own admission, his "study" measured only anti-

14

union animus, and had absolutely nothing to do with activity protected by Title VII.

Second, "both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination." *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987). In *Barnes*, the Sixth Circuit cautioned that any data relied on to support an inference of discrimination in the RIF context must be from a reliable source and must be of sound methodology. *Barnes*, 896 F.2d at 1466. Here, Matney admittedly self-selected those cases he found to be "serious disagreement[s]" as opposed to what he described as less-serious "inquiries." (Matney Dep. 17). For example, Matney identified Akhigbe as engaging in two such "serious disagreements:" one in 2012 and one in 2016. (Matney Dep. 25-26). Matney believes one may have been "a persistent salary issue," and he could not recall the other. *Id.* He recorded one serious incident for Balasubramnian in 2017. He could not recall what that was. (Matney Dep. 25).[6] Matney's evaluation is unreliable evidence, and it has nothing to do with Title VII retaliation.

Furthermore, even if Balasubramnian could make a *prima facie* case of retaliation, which she is unable to, she cannot demonstrate that UA's RIF reasons are pretextual, as discussed above.

## IV. CONCLUSION

Defendant's summary judgment motion is supported as a matter of law on Plaintiffs' Title VII claims of race/national origin discrimination and retaliation. Accordingly, Defendant requests that the Court grant summary judgment in its favor.

Respectfully submitted,

DAVE YOST (0056290)
Attorney General of Ohio

*/s/ Drew C. Piersall*
Drew C. Piersall (0078085)

---

[6] Notably, Gradisher did not make the "serious" list, despite the fact that the union indisputably advocated on her behalf to obtain the pay increase in 2016, and presumably relates to Akhigbe's 2016 "serious" case.

15

> ZASHIN & RICH CO., L.P.A.
> 17 South High Street, Suite 900
> Columbus, OH 43215
> Telephone: (614) 224-4411
> Facsimile: (614) 224-4433
> dcp@zrlaw.com
>
> Sarah J. Moore (0065381)
> ZASHIN & RICH CO., L.P.A.
> 950 Main Avenue, 4th Floor
> Cleveland, OH 44113
> Telephone: (216) 696-4441
> Facsimile: (216) 696-1618
> sjm@zrlaw.com
>
> *Attorneys for Defendant University of Akron*

## CERTIFICATION OF COMPLIANCE WITH LOCAL RULE 7.1(f)

The undersigned certifies in compliance with Loc. R. 7.1(f) that the within case is assigned to the standard track, and that the preceding memorandum is not in excess of 15 pages in length.

> */s/ Drew C. Piersall*
> Drew C. Piersall (0078085)

## CERTIFICATE OF SERVICE

This will certify that the foregoing was filed electronically on December 4, 2023. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

> */s/ Drew C. Piersall*
> Drew C. Piersall (0078085)