PEARSON, J.

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| AIGBE AKHIGBE, *et al.*, | ) | |
| | ) | CASE NO.  5:22-CV-1990 |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| UNIVERSITY OF AKRON, | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | **AND ORDER** |
| | ) | [Resolving ECF No. 26] |

Pending before the Court is Defendant University of Akron's Motion for Summary Judgment.  ECF No. 26.  The motion has been fully briefed.  The parties have filed stipulated facts, as required by the Case Management Conference Order.  ECF No. 25.  After considering the filings, including the stipulated facts, parties' briefs, exhibits, and applicable law, the Court grants Defendant's motion.

## I.    Background[1]

Plaintiffs Aigbe Akhigbe ("Dr. Akhigbe") and Bhanu Balasubramnian ("Dr. Balasubramnian") bring this civil rights action against their former employer University of Akron ("UA").[2]  Plaintiffs were faculty members within the University's College of Business

---

[1] The Court recites the parties' stipulated facts throughout this section.  *See* ECF No. 25.

[2] UA is a state university of higher education and a body politic and corporate pursuant to Ohio Rev. Code. § 3345.011.  ECF No. 25 at ¶ 1.

(5:22-CV-1990)

Administration until their inclusion in UA's July 2020 reduction in force ("RIF").[3]  ECF No. 14 at PageID #: 146.

    **A. Parties**

    UA hired Dr. Akhigbe as the Frederick W. Moyer Endowed Chair in Finance in August 2000.  Because of his status as an endowed chair, Dr. Akhigbe maintained a workload of 9 hours of teaching and 15 hours of research each year, after his first two years at UA.  ECF No. 25 at ¶ 3.  Dr. Akhigbe's race is African American, and his national origin is Nigerian.  He was the only African American faculty member in the Department of Finance at the time of the RIF.[4] ECF No. 25 at ¶ 4.  After being notified of his inclusion in the RIF, Dr. Akhigbe retired from UA.  ECF No. 25 at ¶ 5.

    UA hired Dr. Balasubramnian as a tenured-track Assistant Professor in the Department of Finance in 2011.  ECF No. 25 at ¶ 6.  Dr. Balasubramnian's race is Asian, and her national origin is Indian.  ECF No. 25 at ¶ 7.  Dr. Balasubramnian obtained tenure in 2017 and was promoted to Associate Professor.  Dr. Balasubramnian separated from UA as part of the RIF.  ECF No. 25 at ¶ 8.

    UA and the Akron-American Association of University Professors ("AAUP") are parties to a collective-bargaining agreement ("CBA"), in which the AAUP is the recognized bargaining representative for full-time faculty.  ECF No. 25 at ¶ 2.

---

[3] A RIF occurs when "business considerations cause an employer to eliminate one or more positions within the company."  *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990).
[4] There were nine faculty members in the Department of Finance.  ECF No. 25 at ¶ 4.

2

(5:22-CV-1990)

**B. RIF**

At the end of the 2019-2020 academic year, UA determined that it faced a $65 million-dollar structural budget deficit for fiscal year 2021.  ECF No. 25 at ¶ 9.  Article 15 of the CBA addresses retrenchment and governs the layoff procedure for AAUP faculty.  Article 15, Section 12 contains a *force majeure* clause that permits the University to implement layoffs outside of the retrenchment procedure.[5]  ECF No. 25 at ¶ 10.

On July 15, 2020, UA implemented Article 15, Section 12 of the collective-bargaining agreement, permitting UA to implement layoffs outside the retrenchment procedure.  UA also passed Board Resolution 7-7-20, which eliminated 96 AAUP bargaining unit positions, including Plaintiffs' positions.  In total, nine positions within the College of Business of Administration were eliminated.[6]  ECF No. 25 at ¶ 11.

---

[5] Retrenchment means a reduction in spending.  *Retrenchment*, Merriam-Webster, https://www.merriam-webster.com/dictionary/retrenchment.  Often this requires elimination of employee positions.  The CBA provided that retrenchment may be necessary when one of four circumstances exists at UA: "financial exigency, defined as financial problems so severe that they threaten the University's ability to maintain its operations at an acceptable level of quality; (2) significant reduction in enrollment of a college, department, or program continuing over five (5) or more academic semesters (not including summer) and which is expected to persist: (3) discontinuation of a college, department or program; (4) action by the Ohio Board of Regents or Ohio General Assembly which requires the University to implement a retrenchment." *See Article 15 -- Retrenchment*, https://akronaaup.org/contract/Contract2/Articles/Article15.pdf.

[6] On June 8, 2020, the AAUP filed Grievance 2020-01, which challenged the invocation of Article 15, Section 12 leading to the abolishment of the 96 faculty positions.  In a binding proceeding, an arbitrator, subsequently, upheld UA's invocation of Article 15, Section 12 and found that the elimination of the 96 AAUP positions did not violate the collective-bargaining agreement. ECF No. 25 at ¶ 12.  In July 2020, the AAUP filed Grievance 2020-03, a class action grievance alleging that all 96 bargaining unit members, including Drs. Akhigbe and Balasubramnian, should have received written notice and pre-separation due process prior to the separation of employment.  ECF No. 25 at ¶ 13. This class grievance was later modified to address only those individuals interested in pursuing. Dr. Balasubramnian's grievance was denied.  ECF No. 21-1 at PageID #: 1055.  The record is unclear about the outcome of Dr. Akhigbe's grievance.

3

(5:22-CV-1990)

Prior to implementing the RIF, UA tasked the departments within each college with proposing budget cuts which, in some instances (including the Department of Finance), included the elimination of personnel positions.  ECF No. 25 at ¶ 14.  UA directed the Department of Finance to cut approximately 30% from its Fiscal Year 2020 budget in creating its Fiscal Year 2021 budget.  ECF No. 25 at ¶ 15

At the time of the RIF, Susan Hanlon was the Interim Dean for the College of Business Administration.  James Thomson was the Chair of the Department of Finance and Associate Dean of the College of Business Administration.  Drs. Hanlon and Thomson are Caucasian and American.  *Id.*

The College of Business Administration's Strategic Initiative Team determined the RIF criteria.[7]  ECF No. 25 at ¶ 16.  To this end, the College of Business Administration issued a Total Impact Score to each faculty member by using metrics including research, teaching, and service by using the most recent merit evaluations.  ECF No. 25 at ¶ 17.  These "merit" metrics were scored on a five-point scale.  ECF No. 24-1 at PageID #: 1438  (Dr. Thompson clarifying "[t]he most number of points you can get is a five."). The College also considered a service adjustment, critical adjustment, non-tuition revenue generation potential ("NTRGP"), and whether the faculty member taught in a potentially high growth program ("TIHGP") to determine a professor's Total Impact Score.  These latter four metrics were scored as either a "1" or "0."  ECF No. 25 at ¶ 17.

---

[7]  The members of the Strategic Initiative Team at the time of the RIF included: Dr. Hanlon, Dr. Thomson, Steven Ash (Chair of the Management Department), Deborah Owens (Interim Chair of the Marketing Department), Sucharita Ghosh (Chair of the Economics Department), and Li Wang (Chair of the Accounting Department).  ECF No. 25 at ¶ 16.

4

(5:22-CV-1990)

Dr. Thomson conducted the initial assessment for the Department of Finance faculty members. During this process, Dr. Akhigbe received a total impact score of 12.5.[8] He received the lowest merit teaching score and third-lowest overall score in the Department of Finance. ECF No. 24-1 at PageID #: 1640. Dr. Balasubramnian received a total impact score of 12.48, the lowest total score in the Department of Finance.[9] ECF No. 24-1 at PageID #: 1644.

The initial scores were reviewed and discussed with the Strategic Initiative Team. After conferring with the Strategic Initiative Team, no changes were made to Dr. Thomson's original recommendations. ECF No. 25 at ¶ 18. After assessment of the scores, Dr. Thomson proposed Dr. Akhigbe's position as the first to be included in the RIF from the Department of Finance. ECF No. 24-1 at PageID #: 1444; ECF No. 25 at ¶ 19. The elimination of Dr. Akhigbe's position saved the University $318,571.50, inclusive of benefits. ECF No. 25 at ¶ 21. After submitting its first list of proposed positions to be included in the RIF, including Dr. Akhigbe's position, the Provost's Office instructed the College of Business Administration to include two more positions in the RIF. The Department of Finance then selected Dr. Balasubramnian's position to be included in the RIF. ECF No. 25 at ¶ 20. The elimination of Dr. Balasubramnian's position saved the University $201, 979.17, inclusive of benefits. ECF No. 25 at ¶ 22.

Drs. Akhigbe and Balasubramnian now bring claims of discrimination, based on race and national origin, and claims of retaliation against Defendant. *See* ECF No. 14.

---

[8] The total impact scores ranged from 12.48 to 17.775. *See* ECF No. 24-1 at PageID #: 1632.

[9] Suzanne Gradisher had the second lowest total impact score of 12.485. ECF No. 26 at PageID #: 1679.

(5:22-CV-1990)

# I.     Standard of Review

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 462 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  The fact under dispute must be "material," and the dispute itself must be "genuine."  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In determining whether a factual issue is "genuine," the Court assesses whether the evidence is such that a reasonable jury could find that the non-moving party is entitled to a verdict.  *Id.*  ("[Summary judgment] will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The trial court is not required to search the entire record to establish that a genuine issue of material fact exists."  *Malee v. Anthony & Frank Ditomaso, Inc.*, No. 1:16CV490, 2018 WL 1805402, at *2 (N.D. Ohio Apr. 16, 2018) (citing *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008)) (abrogated on other grounds).  "'[I]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c),' the court may determine that fact is undisputed."  *Malee,* No. 1:16CV490, 2018 WL 1805402, at *2 (quoting Fed. R. Civ. P. 56(e)(2)).

To survive summary judgment, the non-moving party "must 'do more than simply show that there is some metaphysical doubt as to the material facts.'"

(5:22-CV-1990)

F.3d 523, 529 (6th Cir. 2019) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute.  An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved" by a factfinder.  *KSA Enterprises, Inc. v. Branch Banking & Tr. Co.*, 761 F. App'x 456, 464 (6th Cir. 2019) (quoting *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In analyzing a motion for summary judgment, the Court "must view the evidence in the light most favorable to the nonmoving party." *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018) (citing *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017).

## II.     Discussion

### A.  Race and National Origin Discrimination

Title VII prohibits discrimination "against an individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  When, as in the instant case, a Title VII claim is based on circumstantial evidence, the *McDonnell Douglas* burden-shifting framework applies. *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014).  This framework requires a plaintiff to, first, establish a *prima facie* case.

To establish a *prima facie* case, the plaintiff must show that he or she: (1) was a member of a protected class; (2) suffered an adverse employment action; (3) was qualified for the

7

(5:22-CV-1990)

position; and (4) was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees." *Briggs v. University of Cincinnati*, 11 F.4th 498, 508 (6th Cir. 2021) (quoting *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006)).

Plaintiffs sue UA under Title VII.  The parties agree that Plaintiffs satisfy the first three prongs.[10]  ECF No. 26 at PageID #:  1686.

In cases involving a RIF, to satisfy the fourth prong, a plaintiff must show "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons." *Peeples v. City of Detroit*, 891 F.3d 622, 634 (6th Cir. 2018) (quoting *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990)). Defendant argues that Plaintiffs fail to meet the fourth prong.  ECF No. 26 at PageID #: 1686.[11] Plaintiffs retort that they provide statistical and circumstantial evidence that satisfies this standard.  ECF No. 31 PageID #: 2045–48.

---

[10] Dr. Akhigbe is a member of a protected class because of his race (African American) and national origin (Nigerian).  Dr. Balasumbranian is a member of a protected class because of her race (Asian) and national origin (Indian).  They both suffered adverse employment action when their positions were eliminated in July 2020.  Both were qualified for their positions as professors at UA.

[11] Defendant argues, "[]Plaintiffs cannot establish the fourth prong. Indeed, based on the record, it is not entirely clear how Plaintiffs intend on establishing this element. They admit that no one at UA uttered ethnic slurs or otherwise made offensive comments to them or in their presence. [citations omitted] Further[more], they did not retain an expert to conduct any statistical
analyses, or otherwise provide such materials in discovery."  ECF No. 26 at PageID #: 1686.

(5:22-CV-1990)

### 1.  Statistical Evidence

Plaintiffs rely on the disparate analysis prepared by Tami Hannon[12] as statistical evidence that they were singled out for impermissible reasons.[13]  *See* ECF No. 31 at PageID #: 2046. Hannon attests that she used a Fisher Exact Test[14] and that her data indicates that the "observed result is incompatible with a conclusion that [the RIF results] occurred by chance."  ECF No. 32-1 at PageID #: 2091.  Hannon also attests that she used a pool of employees "potentially susceptible to the RIF action" as opposed to the "actual number of employees laid off." Hannon's analyses also do not include "p-values"[15] or results for employees of other races.  *See* ECF No. 17 at PageID #: 189.

The Sixth Circuit has found that "[a]ppropriate statistical data showing an employer's pattern of conduct toward a protected class as a group can, if unrebutted, create an inference that a defendant discriminated against individual members of the class.  *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018).  To create an inference of discrimination, the statistics "must show a significant disparity and eliminate the most common nondiscriminatory explanations for the disparity."  *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1466 (6th Cir. 1990) (citing *Segar v. Smith*, 738 F.2d 1249, 1274 (D.C. Cir. 1984))  The Sixth Circuit has also noted that the most

---

[12] Hannon prepared disparate impact analyses as Director of Equal Employment Opportunity and Affirmative Action at UA in June and July of 2020.  ECF No. 32-1 at PageID #: 2090.

[13] Despite having the opportunity to do so, Plaintiffs do not provide independent statistical analysis, but rely solely on UA's analysis.  *See* ECF No. 9 at PageID #: 99 (CMC Order) (allowing for expert discovery).

[14] The Fisher Exact Test allows a statistician to compare two variables to determine if there is an association based on the exact probability distribution to indicate whether the observed result, or a more extreme result could have occurred by chance.  ECF No. 32-1 at PageID #: 2091.

[15] A "p-value," or probability value, is the measure that the observed result or a more extreme result could have occurred by chance.

9

(5:22-CV-1990)

obvious explanation for discharge in a RIF case is lower proficiency or random chance. *Id.* (quoting *Barnes,* 896 F.2d at 1466) (internal quotation marks omitted). Additionally, a small sample size alongside the absence of actual analysis fails to establish sufficient evidence of discrimination. *See id.*

Plaintiffs argue that 93 is the relevant sample size, in this case, because it is the number of faculty members in the College of Business Administration. ECF No. 31 at PageID #: 2046. They are mistaken.

The Sixth Circuit has consistently determined the sample size to be the number of employees laid off. *See, e.g.*, *Thompson v. Fresh Products, LLC*, 985 F.3d 509, 527 (6th Cir. 2021) (using a sample size of 5 employees laid off); *Peeples v. City of Detroit*, 891 F.3d 622, 635 (6th Cir. 2018) (using a sample of twenty-seven employees laid off). Therefore, the appropriate sample size in this case is nine, the number of individuals selected for the RIF within the College of Business of Administration.[16] The Sixth Circuit has, however, also found a "relatively small sample sizes to be suspect and incapable of supporting an inference of discrimination." *Thompson*, 985 F.3d at 526 (citing *Peeples*, 891 F.3d at 635 (finding sample size of 27 to be insufficient); *Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 943 (6th Cir. 1987) (finding sample size of 17 to be insufficient); *Barnes*, 896 F.2d at 1462–63, 1467 (finding sample sizes of 153 and 165 sufficiently reliable)). The Court, in *Thompson*, went on to hold that a sample size of 5

---

[16] Defendant contends the correct sample size is 2 because Dr. Thomson did not substantively review members outside of the Department of Finance. However, the Strategic Initiative Team used the same criteria for all faculty within the college. *See* ECF No. 24-1 at PageID #: 1415–16. Therefore, the Court looks to the entire college to determine the sample size.

(5:22-CV-1990)

was "too small to provide reliable data."  In this case, the College of Business Administration

sample size of 9 suffers the same fate.

Plaintiffs argue that the analyses, even if a small sample size, indicate a statistically

significant impact.  ECF No. 31 at PageID #: 2046.  The ultimate question is whether Hannon's

analysis of the College of Business Administration is sufficient.  Hannon's analysis did not

indicate statistical significance when measuring the distribution of Asian faculty members

included in the RIF. [17]  ECF No. 17 at PageID #: 189.    Accordingly, the only statistics provided

do not provide evidence to support an inference as to Dr. Balasubramnian.

Statistical analysis is sufficient when provided by an expert statistician whom indicates

that the observed results deviate from the expected results by more than three standard

deviations.[18]  See Barnes, 896 F.2d at 1462–63.  The experts in Barnes provided the court with

detailed reports explaining their findings and concluded "with virtual statistical certainty" that a

protected characteristic was a determining factor in the terminating of employees.  Barnes, 896

F.2d at 1463.  Statistical analysis is not sufficient when it does not provide a "point of

comparison for the facts presented" by only including information about employees in the

protected group at the time of the RIF.  Simpson, 823 F.2d at 944.

Hannon does not purport to be an expert statistician and did not prepare the analysis in

that capacity.[19]  She makes no mention of standard deviations and does not conclude that race or

national origin were determining factors in the termination of faculty members.  She does not

---

[17] Plaintiffs have lodged no objection to Hannon's analysis.  In fact, the parties jointly
submitted true and accurate copies of  Hannon's disparate impact analyses prepared in 2020.
[18] A standard deviation is a measure of variability that indicates how far the
observed value is from the expected value.
[19] As earlier indicated, Plaintiffs submitted no independent statistical analysis.

(5:22-CV-1990)

include a report detailing her findings, her declaration fails to give the Court any additional insight into her report, and she was not deposed.  Additionally, Hannon's analysis omits p-values and results for employees of other races.  This omission precludes the Court or any fact finder from comparing the observed p-values to those for other races.  Without these additional statistics, a factfinder is unable to truly compare the results and determine if there is a significant disparity.  In fact, Hannon's statistics rely on employees susceptible to the RIF, rather than employees laid off or a comparison of statistics before and after the RIF.

A "significant" result without more fails to satisfy the *prima facie* standard.  Considering the above, "the methodology and the explanatory power" of Hannon's analyses are insufficient to permit an inference of discrimination.  *See Simpson v. Midland-Ross Corp.*, 823 F.2d 937, 944 (6th Cir. 1987) ("For statistics to be valid and helpful in a discrimination case, 'both the methodology and the explanatory power of the statistical analysis must be sufficient to permit an inference of discrimination.'").  Therefore, the statistical analysis also fails to establish Dr. Akhigbe's *prima facie* case for discrimination.

### 2.  Pretext[20]

If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to articulate a "legitimate, nondiscriminatory reason for the employee's rejection."  *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464 (6th Cir. 1990) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  If the defendant satisfies this burden, the burden shifts back

---

[20] Defendant interprets Plaintiffs' subjective criteria argument as one to establish the *prima facie* standard.  Plaintiffs do not provide a separate argument regarding pretext.  Therefore, the Court relies on their subjective criteria argument as one for pretext.

(5:22-CV-1990)

to the plaintiff to prove by a preponderance of the evidence that the reasons offered by the defendant were a pretext for discrimination.  *Id.*

To establish pretext, a plaintiff may show that the defendant's proffered reason, (1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.  *Thompson*, 985 F.3d at 522 (citations omitted). Here, Plaintiffs fail to establish the *prima facie* case.  However, even if they had satisfied that standard, they fail to establish pretext.  Plaintiffs do not challenge the legitimacy of the RIF, which is a legitimate, non-discriminatory reason for termination.  Rather, Plaintiffs argue that "subjective criteria" supports a finding of unlawful discrimination.  ECF No. 31 at PageID #: 2046.

Plaintiffs' argument regarding subjective criteria does not effectively establish pretext.  It is nothing more than their own "subjective views of [their own] qualifications in relation to other employees."  *Douglas v. Int'l Auto. Components Grp. N. Am., Inc.*, 483 Fed. Appx. 178, 181 (6th Cir. 2012).  This perspective, without more, does not establish discrimination.  *Id.*  Therefore, the Court finds that even if Plaintiffs had established a *prima facie* case for discrimination claim, they fail to provide evidence of a pretextual reason for their inclusion in the RIF.

**B.  Retaliation Claims**

Plaintiffs also bring a claim of retaliation under Title VII, alleging that their protected activity was "a proximate cause of their 2020 termination."  ECF No. 14 at PageID #: 165.  Title VII prohibits discrimination against an employee because he or she opposed an unlawful employment practice.  42 U.S.C. § 2000e-3(a).  Plaintiffs rely on circumstantial evidence to support their retaliation claims.  Accordingly, this claim is also subject to the *McDonnell Douglas* burden-shifting framework.

13

(5:22-CV-1990)

To establish a *prima facie* case for retaliation, a plaintiff must demonstrate: (1) he or she engaged in activity protected by Title VII; (2) his or her exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was materially adverse to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.  *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014) (quoting *Jones v. Johanns*, 264 Fed.Appx. 463, 466 (6th Cir. 2007)).

### 1.  Dr. Akhigbe's Retaliation Claim

As an initial matter, Defendant argues that Dr. Akhigbe abandoned his retaliation claim because Plaintiffs fail to address his claim in their opposition to the motion.  "When a litigant fails to address a claim in response to a motion for summary judgment, that claim is deemed abandoned or forfeited."  *Bennett v. Hurley Medical Center*, 86 F.4th 314, 324 (6th Cir. 2023) (additional citations omitted).  In its motion, Defendant argues that Dr. Akhigbe fails to satisfy two prongs of the *prima facie* standard.  Plaintiffs do not respond in their opposition.  ECF No. 26 at PageID #: 1694.  Therefore, the Court deems Dr. Akhigbe's retaliation claim abandoned and addresses only Dr. Balasubramnian's claim of retaliation.

### 2.  Dr. Balasubramnian's Retaliation Claim

Defendant concedes Dr. Balasubramnian engaged in protected activity when she filed a complaint with the Equal Employment Opportunity ("EEO")/Affirmative Action Office in July 2018, claiming discrimination after UA denied her backpay.[21]  Defendant also concedes that Dr.

---

[21] Seeking backpay from 2012-2016, Dr. Balasubramnian filed the EEO complaint. ECF No. 30-2 at PageID #: 2017.  Dr. Balasubramnian's EEO request was denied in October 2018, "approximately 19 months before [being] selected for the RIF."  ECF No. 31 at PageID #: 2041.

(5:22-CV-1990)

Thomson was aware of Dr. Balasubramnian's EEO complaint,[22] and that Dr. Balasubramnian was subject to adverse action when her position was included in the RIF. ECF No. 26 at PageID #: 1696–97. Defendant argues, however, that Dr. Balasubramnian fails to establish the fourth prong, that of causation.

To prove causation, a plaintiff must show that the employee's protected activity was a "but for" cause of the adverse action. In other words, the adverse action would not have happened if the employer did not desire to retaliate. *George v. Youngstown State University*, 966 F.3d 446, 459–60 (6th Cir. 2020). This is not a heavy burden at the *prima facie* case stage. *Id.* This burden "can be met through 'evidence that [a] defendant treated [a] plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights.'" *Id.* (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)).

Temporal proximity is one way to establish causation. *See id.* at 460. The parties agree that Dr. Balasubramnian fails to establish temporal proximity between the adverse action and her termination. ECF No. 31 at PageID #: 2049 (acknowledging that 19 months is "not close temporal proximity" between EEO complaint and RIF); ECF No. 32 at PageID #: 2086.

Even if timing alone cannot justify a finding of causation, the employee may prevail from coupling temporal proximity with other evidence of retaliatory conduct to establish causality.[23]

---

[22] Defendant argues that Dr. Balasubramnian should have addressed Rex Ramsier's absence from the decision-making process. ECF No. 32 at PageID #: 2087. Dr. Balasubramnian's activity was not directed at Dr. Ramsier. Therefore, the relevant question is whether decision makers were aware of her complaint.

[23] The Sixth Circuit has, however, stated that "a long temporal gap can by itself be 'fatal' to a plaintiff's retaliation claim." *George*, 966 F.3d at 471 (Rogers, J., concurring in part).

(5:22-CV-1990)

*Id.* (additional citations omitted).  The Sixth Circuit has stated, "the more that a protected activity is temporally distant from the adverse employment action, 'the more the plaintiff must supplement his claim with other evidence of retaliatory conduct to establish causality.'" *Boshaw v. Midland Brewing Company*, 32 F.4th 598, 605 (6th Cir. 2022) (quoting *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 400 (6th Cir. 2010)) (additional citations omitted).  Ordinarily, this additional evidence is presented in the form of additional discrimination between the date the employer learned of the protected activity and the date of termination. *Barrow v. City of Cleveland*, 773 Fed. Appx. 254, 264 (6th Cir. 2019).  For example, evidence that "plaintiff's supervisor treated her 'with exceptional harshness shortly after the initial EEOC filing,' and gave the plaintiff 'an unmanageable workload'" may also suffice. *Id.*  (quoting *Brown v. Lexington-Fayette Urban Cty. Gov't*, 483 F.App'x. 221, 227 (6th Cir. 2012)).

Dr. Balasubramnian does not argue that additional discrimination occurred prior to her termination.[24]  Instead, Dr. Balasubramnian argues that Timothy Matney's Analysis of RIF Grievance Activity, Defendant's improper use of subjective criteria and failure to follow the RIAF guidelines, and Defendant's retention of Dr. Suzanne Gradisher are "other evidence of retaliatory conduct." ECF No. 31 at PageID #: 2049.  Dr. Balasubramnian also points to Defendant's use of subjective criteria and failure to follow the RIF guidelines as further evidence of retaliatory conduct.  ECF No. 31 at PageID #: 2049.

---

[24] Dr. Balasubramnian seems to argue that the RIF posed the first opportunity for UA to retaliate against her after her EEO complaint.  This argument is contradicted by the fact that her name was not on the RIF list until the University asked the College of Business Administration to select additional positions to be terminated.  ECF No. 25 at ¶ 20.  It is further underscored by the offer to allow her to teach in the fall, and her own concessions that Dr. Thomson attempted to help her find other positions.  ECF No. 21-1 at PageID #: 842–43.

16

(5:22-CV-1990)

Dr. Balasubramnian's reliance on UA's retention of Dr. Gradisher is misplaced.  Dr. Balasubramnian relies on Dr. Gradisher's decision to refrain from filing for backpay as evidence that UA retaliated against Dr. Balasubramnian who did pursue backpay.  But UA informs that Dr. Gradisher advocated for and received a pay raise (as did Dr. Balasubramnian) without being included in the RIF.  ECF No. 32 at Page ID #: 2087.  Additionally, Dr. Gradisher is distinguishable as the only remaining faculty member who taught business law, following the RIF.  ECF No. 21-1 at PageID #: 798.  In this way, Dr. Balasubramnian was not similarly situated to Dr. Gradisher.   Dr. Gradisher had different qualifications, permitting her to remain as the sole department faculty member who taught business law courses.  *See* ECF No. 21-1 at PageID #: 798–99.  And as noted above, while Dr. Gradisher's total impact score (12.485) was second lowest, it was still higher than Dr. Balasubramnian's (12.48).

Dr. Matney's analysis, alone, is not sufficient to satisfy the causation standard to establish a *prima facie* case for retaliation.  Dr. Matney's analysis explored whether individuals whom filed "a serious complaint" [25] against UA were more likely to be included in the RIF.   "[B]y Matney's own admission, his 'study' measured only antiunion animus, and had nothing to do with activity protected by Title VII."  ECF No. 32 at Page ID #: 2088.  Matney concluded that faculty were more likely to be on the list "*regardless of the intent of or the process followed by the University*."  ECF No. 27-1 at PageID #: 1784.  This does not illustrate or permit an inference that retaliation led to Dr. Balasubramnian's inclusion in the RIF.  It is not evidence that

---

[25] Matney defined "serious complaints" as "formal grievances, complaints that involved discussion in [Labor Management Committee] for informal resolutions, complaints made against an administrator(s) to the Grievance Office or legal counsel of the Akron-AAUP and raised with the Administration, and complaints involving persistent challenges to [] salary decisions." ECF No. 27-1 at PageID #: 1782.

(5:22-CV-1990)

individuals who filed "serious complaints" were treated with exceptional harshness.[26] Additionally, it does not provide evidence that individuals who did not file "serious complaints" were immune from inclusion in the RIF nor does it establish that Dr. Balasubramnian's EEO complaint caused her inclusion in the RIF. Therefore, Dr. Balasubramnian's reliance on Matney's analysis, even when coupled with her argument that Defendant impermissibly used subjective criteria, fails to satisfy the *prima facie* case standard. For the sake of completeness, the Court conducts an analysis of Dr. Balasubramnian's claim that UA's reason for her separation was pretextual.

### 3. Pretext

UA asserts that Dr. Balasubramnian's termination is the result of the university's financial circumstances, which precipitated the RIF. ECF No. 32 at PageID #: 2084. This nondiscriminatory reason is sufficient for UA to meet its burden.

In response, Dr. Balasubramnian must provide sufficient evidence from which a reasonable juror could conclude that UA made its decision to terminate her position because of her protected activity. Dr. Balasubramnian may do so by showing that UA's proffered (financial) reason, (1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct. *Thompson*, 985 F.3d at 522 (citations omitted).

---

[26] Defendant incorrectly applies the "additional statistical evidence" standard to this analysis. The caselaw discussed by Defendant applies to statistics being used to prove discrimination. *See Simpson v. Midland-Ross Corp.*, 823 F.2d 937 (6th Cir. 1987) (addressing age discrimination); *Barnes v. GenCorp Inc.*, 896 F.2d 1457 (6th Cir. 1990) (addressing age discrimination).

(5:22-CV-1990)

Once again, Dr. Balasubramnian argues that her inclusion in the RIF was not based in fact.  Defendant produced evidence that Dr. Balasubramnian received the lowest overall Total Impact Score.  ECF No. 26 at PageID #: 1679.  As stated above, Dr. Balasubramnian's challenge to her Total Impact Score is based on her opinion about the scores that she and other faculty should have received.  Notably, Dr. Balasubramnian does not provide any evidence that her inclusion in the RIF was based on her EEO complaint, as opposed to her low Total Impact Score.  Instead, she challenges Thomson's application of selection criteria and reliance on such criteria to make the RIF selections.  Dr. Balasubramnian has not made a production sufficient to establish a genuine material of fact.  *See Roschival v. Hurley Medical Center*, 595 Fed.Appx. 923, 929 (6th Cir. 2017) (finding that a decision to engage in an RIF and "application of the RIF policy, even if flawed, and [] reliance on [the] application of the policy, were sufficient to motivate" a decision to lay an employee off).  Accordingly, Dr. Balasubramnian fails to establish that Defendant's legitimate reason, the RIF, was pretextual for retaliation.

### III.    Conclusion

Viewing all the evidence and reasonable inferences drawn therefrom in the light most favorable to Plaintiffs, the Court concludes that there is no genuine issue of material fact and Defendant UA is entitled to judgment as a matter of law.  For the foregoing reasons, Defendant's motion for summary judgment is granted.


IT IS SO ORDERED.


March 29, 2024                                                     */s/ Benita Y. Pearson*
Date                                                                  Benita Y. Pearson
                                                                         United States District Judge

19